Iain CUNNINGHAM, An Infant, by his parent Ronald J. CUNNINGHAM, and Ronald J. Cunningham, Plaintiffs,

v.

QUAKER OATS COMPANY, FISHER–PRICE DIVISION, Defendant.

No. CIV–1973–343C.

United States District Court, W.D. New York.

Aug. 5, 1985.

Swartz & Swartz, Boston, Mass., James M. Buckley, Buffalo, N.Y. (Edward M. Swartz, and Alan L. Cantor, Boston, Mass., of counsel), for plaintiffs.

Phillips, Lytle, Hitchcock, Blaine & Huber, Buffalo, N.Y. (Alexander C. Cordes, and Paul K. Stecker, Buffalo, N.Y., of counsel), for defendant.

CURTIN, Chief Judge.

## I.

In January of 1971, Iain Cunningham, then only 13 months old, ingested an object which a jury found was a toy manufactured by the defendant. Iain suffered severe brain damage, mental retardation, and cerebral palsy because the toy became lodged in his throat and cut off the supply of oxygen to his brain. Iain will require constant care for the rest of his life. Iain's parents, Ronald and Margaret Cunningham, worked extensively with Iain in an attempt to restore their child's ability to function normally. These efforts did not succeed. Iain and his parents were and still are citizens of Ontario. The accident occurred in Ontario, and Ontario law applies to the substantive issues in this lawsuit.

A jury trial was held, and the jury returned the following verdict:

| | | |
|---|---|---|
| 1) For Iain Cunningham | | |
| a) pain and suffering | | $500,000.00 |
| b) future lost earnings | | $500,000.00 |
| c) future medical expenses | | $800,000.00 |
| 2) For Ronald Cunningham | | |
| a) loss of past, present, and future guidance, care, and companionship | | $400,000.00 |
| b) value of services rendered to Iain from date of injury to date of verdict | | $125,000.00 |
| 3) For Margaret Cunningham | | |
| a) loss of past, present, and future guidance, care, and companionship | | $600,000.00 |
| b) value of services rendered to Iain from date of injury to date of verdict | | $175,000.00 |

In an order dated May 2, 1983, the court held that Ontario law required that the jury's verdict on the issue of Iain's pain and suffering be reduced from $500,000 to $125,000. In the same decision, the court also held that Mr. and Mrs. Cunningham had a right, under Canadian common law, to recover the value of the services they provided to Iain. The court also determined that Ontario law entitled the plain-

tiffs to prejudgment interest at a rate of 7.5 percent per annum.

Today's decision addresses the matters raised in a briefing schedule agreed to by the parties (*see* Docket Item 203). These matters include: 1) plaintiffs' motion to amend the complaint to add Margaret Cunningham as a party plaintiff; 2) whether the awards for parental services are excessive; and 3) whether the court ought to grant defendant's motion for a new trial.

A considerable amount of time has elapsed since this case was tried in the summer of 1981. The last of the post-trial motions was submitted on July 23, 1984, marking the end of a briefing and argument schedule which was established on October 27, 1983. *See* Docket Item 203. The two-year delay between the verdict and the establishment of the briefing schedule was caused by the illness of the court reporter whose stenographic notes produced the trial transcript in this case. Counsel believed that the trial transcript was necessary for the briefing of some of the points raised in the post-trial motions. It was not until November 8, 1983, that the last volume of transcript was filed with the Clerk of the court.

## II.

### Motion to add Margaret Cunningham As a Plaintiff

The court shall grant the motion to add Margaret Cunningham as a party plaintiff. At the same time, the court expresses some dismay that counsel for the plaintiffs failed to avoid this issue by making this request earlier or by simply entering Mrs. Cunningham's name in the caption of the original complaint.

Margaret and Ronald Cunningham were both called as trial witnesses in the direct case against the defendant. Margaret was the first witness called. The testimony of these two witnesses was very similar in length and content. Ronald Cunningham's testimony covers 124 pages of the trial transcript (pp. 720–824); Margaret Cunningham's covers 107 pages (pp. 58–165).

Mr. and Mrs. Cunningham both testified about the events leading up to Iain's accident and the aftermath of this tragic event. Both gave testimony concerning identification of the object Iain ingested. Moreover, both told the jury about the many hours of "brain patterning" therapy they administered to Iain in an effort to restore the child's capacity to engage in normal physical activity.

The court has also noted a striking similarity in the way the defendant cross-examined these two witnesses. The accident and the identification of the object Iain ingested were pursued in detail. In cross-examining Mrs. Cunningham, the defendant did not touch upon the subject of brain patterning at all. As for Mr. Cunningham, the defendant's cross-examination touched upon brain patterning only with regard to some simple equipment Mr. Cunningham built at a cost of about $400. Tr., p. 819.

When it came time to instruct the jury, some disagreements arose concerning Mrs. Cunningham's status in this lawsuit. As the discussion moved to the question of damages for the parents, defense counsel took exception to an item of damages concerning the value of services rendered by Iain's mother and father. Defense counsel stated that "Mrs. Cunningham is not a plaintiff." Tr., p. 1694. Counsel then noted that the complaint named Mr. Cunningham individually and as Iain's representative. Counsel stated that Mrs. Cunningham could have sued, but did not. I then stated that I would tell the jury to consider the services of both parents. At defense counsel's request, I agreed to instruct the jury to consider the value of the parents' services separately. Tr., pp. 1694–95.

After the jury returned its verdict, the court discussed plaintiffs' post-verdict motion to amend the complaint adding Mrs. Cunningham as a plaintiff. At that time, I rejected the suggestion by plaintiffs' counsel that defense counsel implicitly agreed to submit Mrs. Cunningham's claims to the jury when he asked the court to have the jury consider the parents' services separately. Tr., pp. 1890–93.

There were other occasions when parental services were discussed by the court and counsel. One occasion was during a discussion of the Ontario Health Insurance Plan's coverage of some expenses that would have been incurred by Mr. Cunningham. During that colloquy, plaintiffs' counsel suggested that this head of damages was relatively insignificant. At this point, he mentioned that there would be evidence of the "value of the mother and father's services ... over and above what they give to a normal child." Tr., pp. 774–75. Defense counsel responded to an inquiry by the court on this subject by stating that "that plainly is non-compensable, what a parent does. That problem I can deal with as a legal matter." Tr., p. 776.

The court's recollection, affirmed by its review of the record, is that the issue of Mrs. Cunningham's damages was actually tried before the jury in this case and that this was with defendant's knowledge. Mr. and Mrs. Cunningham were examined and cross-examined in the same way. The proof elicited from Mrs. Cunningham in the questions relating to value of services and loss of guidance and companionship was no less a matter of concern for the defendant than the proof elicited from Mr. Cunningham on these same points. The virtually non-existent cross-examination of Mr. Cunningham on the issue of services rendered in connection with the brain patterning effort indicates to the court that this case would not have been defended in a substantially different manner if Mrs. Cunningham's name appeared on the complaint.

Nor does the court accept the defendant's contention that the issue of damages for Mrs. Cunningham did not occur to the defendant until after the close of the evidence. Evidence of an earlier awareness can be seen from the following exchange during Mrs. Cunningham's testimony when she recounted the brain patterning effort.

Q: Now, tell us what it is? Can you explain, perhaps, having been involved with it for such a long period of time, can you explain what pattening [sic] is, neurological brain pattening [sic]?

Mr. Cordes: If the Court please, she should only describe what she did.

Tr., p. 84. "[W]hat *she* did" is, of course, relevant primarily to the question of the extent and value of the services Mrs. Cunningham gave to her son. This exchange occurred early in the trial, and its significance is not entirely clear. However, defense counsel's remark came almost directly following a statement by Mrs. Cunningham to the effect that *several persons* helped her in the brain patterning effort. This context supports the view that the defendant wanted the jury to focus upon the value of Mrs. Cunningham's efforts, and not those of others, and it suggests that the defendant believed that this was an issue in the case.

Rule 15(b) of the Federal Rules of Civil Procedure provides that "[w]hen issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." Amending the pleadings to conform to the proof at trial may be done "at any time."

The decision to grant or deny a motion to amend a complaint is committed to the sound discretion of the court. *Koster v. Modification Systems, Inc.*, 731 F.2d 1014 (2d Cir.1984); *Browning Debenture Holders' Committee v. DASA Corp.*, 560 F.2d 1078 (2d Cir.1977). In deciding such motions, the court must consider

the presence or absence of such factors as "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc."

*Browning Debenture Holders' Committee v. DASA Corp.*, 560 F.2d at 1086, *quoting Forman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962). When leave to amend is sought pursuant to Rule 15(b), the most important factors are whether the issues raised in the amended pleading were tried by the parties' express or implied consent and whether the defend-

ant would be prejudiced. Prejudice is indicated when the amendment deprives the defendant of a fair opportunity to defend against the new issues raised and deprives him of the chance to offer additional evidence. *Id.; Evans Products Co. v. West American Insurance Co.*, 736 F.2d 920 at 924 (3d Cir.1984).

■ Considering the aforementioned factors, the court finds that granting the motion to amend· is proper. There is no indication of bad faith or dilatory motive. Nor has there been any history of failing to cure deficiencies in spite of amendments previously allowed.

The previous discussion of the Cunninghams' testimony is pertinent to the prejudice factor. It is true that denying this motion would greatly reduce the dollar amount of the judgment against the defendant. This, of course, indicates "prejudice" in one sense of the word. However, "prejudice" in terms of Rule 15(b) is more sensibly viewed in connection with the consideration the court must give to a related factor in the mix of elements to be weighed on a motion of this sort. That factor is whether the defendant was deprived of an opportunity to present evidence to defeat the claims made against him. This view reflects the purposes of pleading (*i.e.*, to give notice to the opposition as to what it must defend against) and the restrictions which courts must place upon amendments. The factors set forth above indicate that the restrictions upon amendments exist chiefly to prevent confusion, delay, and the chance that a party will find itself on the short end of a judgment without having been given a fair opportunity to defeat the claims asserted against it.

Taking this view, I find that the defendant will not be unduly prejudiced by allowing the instant motion. As previously noted, the defendant did not seriously attack the plaintiffs' proof on the issue of the value of the services rendered to Iain by his parents. Nor did the defendant seriously question the matter of the parents' loss of companionship. The defendant's attack on these items of damage was chiefly

legal; *i.e.*, that these damages were "not compensable." Tr., p. 776. To the extent the defense was factual, it centered around the contention that there was no negligence, that the object Iain swallowed was not a toy manufactured by the defendant, and that there was contributory negligence on the part of either or both parents.

The court is aware that implied consent to the trial of an entirely extrinsic issue shall not be inferred merely from the fact that a party did not object to evidence which was introduced because it was relevant to another issue in the case. 3 Moore's Federal Practice, ¶ 15.13[2], p. 15–171 (1984). However, the issue of Mrs. Cunningham's damages was not entirely extrinsic to the case. Moreover, evidence of Mrs. Cunningham's efforts at brain patterning was squarely relevant only to the issue of the value and extent of services provided by her. Still, the defendant did not object to it.

Considering the record as a whole, I find that the issues regarding Mrs. Cunningham's damages were tried by the implied consent of the parties. Accordingly, the motion to add Mrs. Cunningham as a plaintiff is granted.

It now remains to determine whether Mrs. Cunningham's claims relate back to the filing of the original complaint. If they do not, then the claims are barred by the statute of limitations, because the motion to amend the complaint was filed more than ten years after the cause of action accrued. The court concludes that, under Fed.R.Civ.P. 15(c), Mrs. Cunningham's claims relate back to the date of the original pleading.

Rule 15(c) provides, in relevant part, as follows:

(c) *Relation Back of Amendments.* Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading. An amendment changing the party against whom a claim is asserted relates back if the foregoing provision is satisfied and, within the peri-

od provided by law for commencing the action against him, the party to be brought in by amendment (1) has received such notice of the institution of the action that he will not be prejudiced in maintaining his defense of the merits, and (2) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against him.

Fed.R.Civ.P. 15(c). The rule plainly does not forbid amendments which add parties to the lawsuit. By clear implication and by judicial construction, the second sentence of Rule 15(c) permits the addition of parties even after the statute of limitations has expired. *See, e.g., Wassel v. Eglowsky*, 399 F.Supp. 1330, 1335 n. 1 (D.Md.1975), *aff'd*, 542 F.2d 1235 (4th Cir.1976) (*per curiam*); 6 C. Wright & A. Miller, *Federal Practice and Procedure*, § 1501 at 524; 3 *Moore's Federal Practice*, ¶ 15.15[4.–1].

As previously noted, the basic guide to analyzing amendments to complaints should be the purpose that pleadings serve in a lawsuit. For a plaintiff that purpose is to notify the opposing party of what it must defend against. If a defendant is fully apprised of the conduct which has given rise to the action, his ability to defend will not be impaired. In some cases, this will be true even if a new plaintiff is added. 6 C. Wright and A. Miller, *Federal Practice and Procedure*, § 1501 at 524. The court believes that this is such a case.

It is true that the original complaint in this case made no mention of Mrs. Cunningham. However, the infant plaintiff's injuries were pleaded, and the infant's father sued on behalf of Iain and individually. The defendant thus knew that this was a lawsuit which asserted both direct personal injury and derivative parental claims. Mrs. Cunningham's claims are parental claims, which are replicas of those asserted by Ronald Cunningham—a plaintiff named in the original complaint who bears an identical relationship to the injured infant.

It is also true that the defendant argues that it will be prejudiced by the addition of Mrs. Cunningham's claims, a factor which distinguishes this case from *Wassel v. Eglowsky, supra*. However, the conduct of the trial which was held before me has convinced me that the only sense in which the defendant has been prejudiced is that the damages assessed against it will be increased if the complaint is allowed to be amended and the claim of the added party is held to be timely. This meaning of "prejudice" is not central to determining whether claims asserted in amended pleadings should relate back. Indeed, increased damages will often be a by-product of a successful motion under Rule 15(c). 6 C. Wright and A. Miller, *Federal Practices and Procedure*, § 1501 at 527.

Finally, the defendant distinguishes the present application under Rule 15(c) from the concededly more typical case wherein a person named in the original complaint seeks an amendment which merely changes the capacity in which he or she is suing. *See, e.g., Williams v. United States*, 405 F.2d 234 (5th Cir.1968). However, this distinction is not sufficient to compel the denial of the present motion or a determination that the amendment does not relate back. The court's task is simplified when a plaintiff merely changes the capacity in which he or she sues, but the court should not take the simplistic view that only the motions which raise simple questions shall be granted. Motions such as the present one should stir a court's sense of caution, and this motion has. It is with this approach that the court has determined that the claims raised by Mrs. Cunningham are so identical in kind and in origin that, at the request of her husband and son, she should be added as a plaintiff to this case, and her claims shall relate back to the date of the original pleading. Consequently, her claims stand upon the same footing as those of Mr. Cunningham for purposes of timeliness.

### III.

#### *Extent of Damages for Parental Services*

In my order of May 2, 1983, I held that there was a basis in Ontario common law

for the awards to Mr. and Mrs. Cunningham for parental services. *See* Order of May 2, 1983, p. 18. The jury in this case awarded $125,000.00 to Mr. Cunningham and $175,000.00 to Mrs. Cunningham for this item of damages. The defendant now asks the court to reduce both awards to amounts no greater than $60,000.00.

The jury's verdict on this item of damages represents work done by Mr. and Mrs. Cunningham over the ten-year period between the time of injury to the time of trial. Thus, the jury valued Mrs. Cunningham's services at $17,500 per year and Mr. Cunningham's at $12,500 per year.

The question presented with respect to this item of damages is considerably different from the question raised—and answered in defendant's favor—with respect to damages for Iain's pain and suffering. In the court's order of May 2, 1983, Iain's damages for pain and suffering were reduced by $375,000.00 in accordance with Canadian case law, which places a ceiling upon damages for pain and suffering. *See, Andrews v. Grand & Toy Alberta Ltd.*, [1978] 2 S.C.R. 229; *Thornton v. Board of Trustees of School District No. 57*, [1978] 2 S.C.R. 267; *Arnold v. Teno*, [1978] 2 S.C.R. 287; *Lindal v. Lindal*, [1981] 2 S.C.R. 629. The first three of these cases announced a rule of substantive law which prevails in Canada on damages recoverable for pain and suffering.

This rule has no counterpart which applies to parental services. The authorities cited in the affidavit submitted by the defendant's expert in Canadian law (Docket Item 206) are not the functional equivalents of the aforementioned cases decided by the Supreme Court of Canada. The cases cited by the defendant's expert merely state what amounts are supported by the evidence in those cases. These cases do not announce a rule of substantive law. Consequently, reviewing the excessiveness of this verdict shall be done according to federal law. Restatement, Second, Conflict of Laws, § 171, Comment f; 11 6 C. Wright and A. Miller, *Federal Practice and Procedure*, § 2802 at 30–31 (1973).

The court does not find that the awards to Mr. and Mrs. Cunningham for parental services are unreasonable or unjust. Consequently, the court will not reduce the amounts awarded by the jury. The $125,000.00 verdict for Mr. Cunningham and the $175,000.00 verdict for Mrs. Cunningham for parental services rendered to their seriously injured son over a period of ten years shall stand.

### IV.

*Defendant's Motion for a New Trial*

The defendant seeks a new trial pursuant to Fed.R.Civ.P. 59(a). The grounds for this motion include what the defendant regards as the improvident admission of testimony concerning product identification, the court's refusal to admit a defense exhibit containing a Canadian toy regulation with which the ingested object was in compliance, and insufficiency of the evidence on the issues of the infant plaintiff's lost earnings and the cost of future medical care.

### A. *Product Identification and Plaintiff's Exhibit 1*

Plaintiff's Exhibit 1 was a toy figurine. The figurine was a passenger to a toy bus made by Fisher Price. The jury found that Iain ingested this toy. Defendant argues that there was an insufficient basis for this finding. The court will adhere to the ruling on this issue made at the close of plaintiff's case upon defendant's motion to dismiss. Tr., pp. 1172–78, 1188.

Defendant's chief contention is that the court erroneously admitted into evidence the testimony of Dr. Yves H. DeLaBastide. Dr. DeLaBastide is an otolaryngologist (*i.e.*, an ear, nose, and throat specialist) who was in the emergency room at the Ottawa, Ontario, hospital where Iain was taken following the accident. Tr., p. 1043.

The testimony of Dr. DeLaBastide was presented to the jury by reading from his pretrial deposition. Defense counsel urges now, as he did at trial, that counsel for plaintiff conducted the deposition in such a

grossly improper way that it should not have been admitted into evidence. The court agrees that plaintiff's counsel's questioning was done in very bad form. However, the court will adhere to its trial ruling on this question (Tr., pp. 1038–39), because the DeLaBastide testimony was not so tainted as to require its exclusion. Moreover, there was other evidence in the case which supported the jury's finding regarding product identification.

The most serious transgression alluded to by defense counsel occurred during the following exchange at the DeLaBastide deposition.

BY MR. SWARTZ:

33. Q. Did you ever see the object?

A. I think I did, but the details I don't remember.

34. Q. But from what you remember and only from what you remember, what do you remember the object to be? Do you remember it to be a toy?

A. I remember it was a small toy.

35. Q. I am showing you this doctor, the one that was provided by Mrs. Cunningham on her Deposition. Does this appear to be the object that you saw that day?

MR. STECKER: Object to form. There has been no foundation for that whatever. I want the record to show that a toy figure has been produced and put in front of the witness. There has been absolutely no foundation, no description of the object laid prior to the showing of this object.

MR. SWARTZ: Sure.

THE WITNESS: Sorry, I forgot the question.

The next question asked at the deposition was: "Does this appear to be the object you recall seeing that day?" The witness answered, "As I vaguely remember, yes." Tr., pp. 1046–47.

Defense counsel asked at trial that the entire deposition be excluded. Tr., p. 1039. I declined to exclude the entire deposition. Instead, I ruled that Question 35 (*see* p. 74, *supra*) would not be read to the jury.

I also ruled that another question would not be read. After I made my ruling, defense counsel stated his "objection to [the court's] ruling . . . . Because we feel the entire deposition should be stricken because of the improper suggestive questions." Tr., p. 1039.

Defense counsel now suggests in his brief (Item 210, p. 18) that excluding Question 35 compounded what he argues was the error of admitting the deposition. Counsel states that this caused the jury to be unaware that DeLaBastide's identification of the toy was the result of "prompting" by the plaintiff's attorney. However, when the court made its ruling at trial, defense counsel did not suggest that Question 35 be read to the jury. Thus, if the court erred in permitting the deposition to come into evidence, defense counsel must share in the responsibility of compounding any error that was made.

■ But, I do not believe it was error to admit the deposition. It was clear from the witness's testimony that his recollection of what Iain ingested was "vague." It was also clear to the jury that a leading question was asked to elicit the witness's answer. Tr., pp. 1046–47. These weaknesses in DeLaBastide's identification testimony could have been emphasized during closing arguments in order to attack the testimony's weight and credibility.

■ There was also circumstantial evidence which permitted the jury to find that plaintiff's Exhibit 1 was the object that Iain ingested. Neither Mr. nor Mrs. Cunningham saw Iain put an object into his mouth. However, Mrs. Cunningham was playing with Iain on the living room floor just before the accident, and Mr. Cunningham noticed that the Fisher-Price bus and the toy figurines were on the floor. There was nothing else on the floor. Tr., p. 725. There was also testimony that plaintiffs' Exhibit 1 was recovered at the hospital to which Iain was taken. The toy was placed in a manila envelope which was given to Mr. Cunningham when Iain was discharged. Tr., pp. 804–05. Based upon the entire record in this case, the court believes

that there was a sufficient basis for the jury's finding that it was plaintiff's Exhibit 1 that Iain put into his mouth. I also find that the imperfections concerning the De-LaBastide testimony do not warrant a new trial.

### B. *The Canadian Toy Size Regulation*

Defendant's Exhibit 21 was a Canadian toy size standard promulgated on November 4, 1970. The regulation provided, in pertinent part, as follows:

7. No product included in item 12(c) of Part II of the Schedule to the [Hazardous Products] Act shall have a component intended to be separable the largest dimension of which is more than $^{11}/_{16}$ inch (17 mm) and less than $1^3/_{16}$ inches (30 mm) between.

The largest dimension of the toy Iain ingested was $1^7/_8$ inches. Tr., p. 700. Thus, if the regulation applied, the toy was in compliance with it. The court eventually ruled that defendant's Exhibit 21 would not be admitted into evidence.

The jury first heard testimony regarding the Canadian toy standard when defense counsel cross-examined plaintiff's expert witness. Plaintiff's expert stated that the toy Iain ingested had a dimension of $1^7/_8$ inches, and then acknowledged that it met the requirements of the toy standard. Tr., p. 701. On redirect examination, plaintiff's expert was asked if the regulation was adequate. He responded as follows:

It is ridiculous because that object can be put in the child's mouth and once in the child's mouth it presents a significant hazard for the child suffocating. It's an inadequate standard.

Tr., p. 703.

The toy regulation was also mentioned during the testimony of defendant's expert, Robert Ostrander. Mr. Ostrander was involved in designing Fisher-Price's "Play Family" figures of the type at issue in this case. He testified that when he designed these figures in 1965, "there were no government regulations outstanding." Tr., p. 1366. Earlier, Mr. Ostrander testified that in about 40 years of selling toys with parts the size of the Play Family figurines, "We never had a report of any problem." Tr., p. 1346. Later, the witness was asked if he became aware of any regulations that took effect prior to January 30, 1971, the day the accident occurred. Mr. Ostrander answered that he did. Defense counsel showed him Defense Exhibit 21 and asked if that was the regulation. Mr. Ostrander answered that it was. Tr., p. 1367. The plaintiffs did not object to any of these questions.

Plaintiffs did object when the defendant offered the exhibit into evidence. Tr., p. 1367. The exhibit was the text of the toy regulation. However, counsel for plaintiffs clearly indicated that defense counsel could ask the witness his opinion of whether the toy complied with the regulation. Tr., p. 1368. And, while counsel did not say so explicitly, it does not appear that plaintiffs would have objected if defense counsel had asked what Mr. Ostrander thought about the regulation's adequacy.[1] Certainly, this would not have been objectionable, because the plaintiffs had asked their own expert the same question. *See,* Tr., p. 703. Thus, the defendant was clearly free to counter the opinion of plaintiff's expert that the regulation was "ridiculous" with an opinion from its own expert that the regulation was wise. On page 14 of its memorandum in support of its motion for a new trial (Docket Item 210), the defendant states that "it expected its own witness to testify to the subject toy's compliance." The foregoing demonstrates that it was not the court's ruling that frustrated this expectation. Defense counsel simply did not pursue this point with his expert witness.

The more serious part of the defendant's argument is that the court's ruling de-

---

1. The implication that such a question would not have been objected to is very clear. As soon as the defense offered its Exhibit 21, plaintiffs objected "to the offer, not the question." Tr., p. 1367. The "question" was if Mr. Ostrander rec-ognized Exhibit 21 as the Canadian toy size regulation. Soon thereafter, counsel for plaintiffs said that the jury ought not have "the text of the law."

prived the defendant of a jury instruction to the effect that compliance with the regulation was evidence of due care. The defendant is correct to the extent that the result of excluding Defense Exhibit 21 was that the jury was not given an instruction about the regulation. Tr., p. 1564.

However, it should be noted that the court did not rule that the regulation was *per se* inadmissible. The court stated that the meaning of the regulation was unclear, so that its applicability was in serious question.[2] The court's problem about applicability stemmed from language in the regulation that toys shall not have any "component intended to be separable" unless such components were larger than $1\frac{3}{16}$ inches or smaller than $\frac{11}{16}$ inch. The figurine ingested by Iain Cunningham could be purchased separately, but it was also meant to be a toy passenger to a toy bus made by Fisher-Price.

The court would not permit the regulation to come into evidence on the strength of Mr. Ostrander's testimony, because Ostrander's expertise as a toy designer could not help the court solve its problem of the regulation's applicability. However, the court did tell defense counsel that, under Fed.R.Civ.P. 44.1, the regulation would be admissible if the defendant brought in a witness who could "tell us what it means as a matter of law." Tr., pp. 1388–89. The court then stated that a written submission would be permitted "if that would satisfy the problem" of the regulation's applicability.[3]

On the next trial day, defense counsel brought into court a brief affidavit from the director of Canada's governmental department charged with administering Canada's Hazardous Products Act. The affiant said the toy standard took effect on November 4, 1970. He stated he was familiar with the design of the Fisher-Price bus and the figurines and that it was his opinion that each figurine is "a component intended to be separable" within the meaning of the regulation.

During the colloquy which followed the presentation of the affidavit, the court indicated that its problems were still unresolved. It was noted that the regulation might have applied only to assembly toys with detachable parts. (The affidavit did not discuss that issue.) The court finally stated that, "[w]e ought to have a live witness" so that questions could be addressed to him. Tr., p. 1544. Defense counsel did not ask for an opportunity to produce a live witness. Following a luncheon recess, the court announced its ruling that the regulation would not be admitted into evidence. Tr., p. 1562.

The Canadian regulation presented a question of foreign law. Fed.R.Civ.P. 44.1, dealing with foreign law questions, provides as follows:

A party who intends to raise an issue concerning the law of a foreign country shall give notice in his pleadings or other reasonable written notice. The court, in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination shall be treated as a ruling on a question of law.

The first sentence of the rule was clearly satisfied in this case; the court was aware that issues of Ontario and Canadian law

---

**2.** The court also expressed concern about the effective date of the regulation, but this was a much less serious concern. *See,* Tr., pp. 1535–36, 1547. The court's chief concern was with the meaning of the regulation. Timing was an issue raised by the plaintiffs because the toy was bought on November 14, 1970, and there was some confusion as to whether the regulation became effective on the date of promulgation (November 4, 1970) or the date of publication in the *Canadian Gazette* (November 25, 1970). Defense counsel was able to persuade the court

that even if the effective date was after the toy was purchased, compliance with the regulation would be evidence of due care. *See Stonehocker v. General Motors,* 587 F.2d 151 (5th Cir. 1978).

**3.** The court's remarks were made on Friday, June 12, 1981. The next trial day was Tuesday, June 16, 1981. The court did not set a deadline regarding the defendant's submission on this point.

would arise. The rule's provision that "any relevant material" may be considered in determining foreign law makes it clear that the court could consider the affidavit which the defendant presented on this issue. *See e.g., United States v. First National Bank of Chicago*, 699 F.2d 341, 343–44 (7th Cir. 1983). The court did consider this affidavit and concluded that it was insufficient to make a determination.

The rule's provision that the court *may* rely upon "any relevant material" gives courts flexibility in their approach to determining questions of foreign law. Courts are free to conduct their own research instead of always relying upon testimonial evidence or written argument presented by attorneys. However, the rule does not *require* the court to engage in its own research, and the rule preserves the court's right to insist that the proponent of the foreign law present evidence on the question. 9 Wright & Miller, *Federal Practice and Procedure*, § 2444, p. 408. In the present case, the court made its preference for a live witness clear. Defense counsel instead produced an affidavit which did not answer some of the questions which troubled the court. Counsel stated that it lacked authority to subpoena a Canadian expert, but then acknowledged that he could probably secure the presence of a member of the Canadian bar. Tr., p. 1545. However, counsel did not ask for an opportunity to produce any witness, despite the fact that Toronto (Ontario's provincial capital and Canada's largest legal community) is only a two-hour drive from Buffalo, New York, the site of this trial. There was every indication that the court would have permitted the defense to call an Ontario attorney if only counsel had asked.

■ From all the discussions on this point between the court and counsel, it ought to have been clear to the defendant that a live witness to whom the court and the plaintiff could have put questions was the court's preferred manner of proceeding. In the absence of a live witness, counsel ought to have been aware that any written submission should have been con-

siderably more detailed and explanatory than the affidavit which counsel submitted. For these reasons, I do not believe that, under the circumstances of this case, it was error not to admit Defense Exhibit 21 into evidence.

C. *Future Income and Future Medical Costs*

1. *Qualifications of Plaintiff's Expert*

The plaintiffs called one witness to testify on the subjects of future lost income and future medical expenses. The witness was medical economist Harold M. Goldstein. The defendant called no witnesses to testify on either of these points. The defendant's general complaint is that Dr. Goldstein was not qualified to testify about either subject. The court disagrees.

Dr. Goldstein holds a Ph.D. in economics from Clark University. He also taught economics at Clark in the 1950s. He has been an economics instructor at Northeastern University since 1961, where he is now a full professor and Executive Director of the Department of Economics and Director of the Center for Medical Manpower Studies. Tr., pp. 886–87.

Dr. Goldstein's professional experience includes close associations with several hospitals and medical schools. At the time of trial, he had been Senior Scientific Associate at Boston City Hospital for six years. Prior to that, he spent two full academic years overseas as Senior Scientific Associate at University of Rome hospitals in Gemelli and Santo Sprito in Rome. While in Rome, he was appointed Senior Fullbright Research Scholar. His responsibility was to run eight separate hospitals (about 10,500 beds) under one administration. Health care administration and utilization of medical personnel were important aspects of this work. Tr., pp. 887–89. Finally, Dr. Goldstein has published more than 100 research articles dealing with such subjects as public health and health care. Tr., p. 889.

■ The Federal Rules require that an expert be qualified "by knowledge, skill,

experience, training, or education." Fed.R. Evid. 702. Dr. Goldstein's academic background and extensive practical experience provided him with sufficient expertise to testify regarding the cost of future medical care.

Defendant's contention that Dr. Goldstein lacked the actuarial skills necessary to make the computations necessary to calculate the costs of future care is without merit. Actuarial science is not Dr. Goldstein's specialty, but he is trained as an economist and, in response to a question as to whether he is an actuary, Dr. Goldstein replied that "[in] some measure," he is. Tr., p. 891. More to the point, the court was then, and is now, satisfied that it was not necessary to have an expert whose *specialty* was actuarial science in order to make what were essentially arithmetic computations.

Finally, the defendant spent very little time challenging Dr. Goldstein's qualifications in front of the jury. A short distance into plaintiffs' direct examination, I assented to defense counsel's request for a preliminary examination. After a few questions, the court suggested that it would be less confusing if the defense made its points on cross-examination. Tr., p. 894. Defense counsel did not, on cross-examination, challenge Dr. Goldstein's professional qualifications. As will be discussed below, the defendant's attack upon Dr. Goldstein, in arguments to the court and in questions asked in front of the jury, was almost exclusively directed at the his credibility, not his competence. In the final analysis, it was for the jury to determine the weight to be given to the expert's testimony in light of his qualifications and the evidence admitted at trial. The jury, as the trier of facts, could have rejected this testimony entirely. *Dodge v. Stine,* 739 F.2d 1279 (7th Cir.1984); *Price v. Admiral Corporation,* 527 F.2d 412, 415 (5th Cir.1976).

### 2. *Loss of Future Income*

The jury awarded Iain $500,000 in damages for future lost income. The defendant argues now, as it did at trial, that Dr.

Goldstein's testimony on this item of damages should have been disallowed because it was "inherently unbelievable." This argument is based upon defendant's accusation that Goldstein made disingenuous eleventh-hour adjustments in his computations in order to cover up an oversight that had entered into his pretrial calculations regarding future lost income. The defendants also contend that the jury's award was excessive, because it exceeded the estimate supplied by plaintiffs' expert.

Ontario law provided that the present value of future lost income had to be calculated by use of a 2.5 percent discount rate, which accounted for interest and inflation. This is consistent with the preferred practice in this circuit. *See, Doca v. Marina Mercante Nicaraguense, S.A.,* 634 F.2d 30 (2d Cir.1980), *cert. denied,* 451 U.S. 971, 101 S.Ct. 2049, 68 L.Ed.2d 351 (1981) (suggesting a 2 percent discount rate). Dr. Goldstein was unaware of this until the evening before he took the witness stand. Tr., pp. 892–93. He had been retained by the plaintiff as an expert many months before that time and had made several computations of future lost income using a discount rate of 1.6 percent. Using this rate, he calculated that the present value of Iain's lost income was $1,035,000.81. This figure was arrived at by the use of an additional factor called the "growth rate." The growth rate is an individual's estimated annual increase in earning power, expressed as a percentage. In his pretrial calculations, Dr. Goldstein used a growth rate figure of 3.5 percent. Tr., pp. 906, 941–43.

Defense counsel established on cross-examination that Dr. Goldstein learned of the correct discount rate only within hours of taking the stand, and that he changed the growth rate from 3.5 percent to 4.4 percent the evening before he testified. The result was that Dr. Goldstein arrived at the same lost-income figure of $1,035,000.81. The discount rate adjustment was required by Ontario law, and counsel accused the witness of raising the growth rate by the exact amount necessary in order to make

his pretrial and trial calculations appear consistent.

Defendant's request to strike Dr. Goldstein's testimony was made outside of the jury's presence during a long colloquy with the court. The court heard the witness explain that he obtained the 4.4 percent growth rate figure from the average growth rate in Canada between 1940 and 1976. Tr., pp. 962–63. The court accepted this as sufficient evidence that the testimony was not tainted. Tr., p. 970. The court adheres to that ruling today. The Goldstein testimony was not inherently untrustworthy.

During the same discussion outside the jury's presence, the court made another ruling which resulted in a severe reduction in Dr. Goldstein's calculation regarding future lost income. Over plaintiffs' objection, the court disallowed the use of any growth rate factor in the estimation of future lost income.[4] Tr., pp. 970–72. Defense counsel had not asked for such a ruling, as his only complaint at that juncture was Dr. Goldstein's alleged untrustworthiness. The court's disallowance of the use of any growth rate figure meant that when the jury returned, it was to be instructed that Dr. Goldstein's calculation had to be modified. The court told the jury that, assuming Iain completed college, Dr. Goldstein's calculation of future lost income would be $263,556.47, instead of $1,035,000.81. Tr., pp. 990–91. Dr. Goldstein's calculation dropped to $209,998.00 if the assumption was that Iain would not attend college. Tr., p. 992.

Another part of the court's ruling was that defense counsel would not be able to continue its line of cross-examination concerning Dr. Goldstein's figure adjustments in front of the jury. Counsel wanted to pursue this line for impeachment purposes. The court believed that this would cause undue confusion, given the fact that no growth rate would be allowed to enter into Dr. Goldstein's calculations. The court told defense counsel that it would instruct the jury to "disregard the testimony that they heard about the [4.4 percent] figure." Tr., p. 978. When the jury returned, the words actually used by the court were that "you are to ignore [the 4.4 percent and 3.5 percent] figures and the calculation that came about to get to those figures." Tr., p. 991.

This ruling did prevent further pursuit of defendant's attack upon Dr. Goldstein's credibility. However, the court does not believe that, under all of the circumstances, disallowing further cross-examination had an overall prejudicial effect upon the defendant. The court's instruction did not expressly forbid the jury to disregard defense counsel's prior cross-examination. The jury was not told to disregard the fact that Dr. Goldstein had changed his mind. Assuming the instruction did have that effect, the court nonetheless believes that the unsolicited benefit gained by the defense as a result of the court's disallowance of the use of any growth rate factor negates any prejudice that defendant might have incurred.

██ Finally, the court does not believe that the jury's verdict on lost future income was excessive. The award exceeds the amount specified by plaintiffs' expert. However, it is speculation on the part of the defendant when it argues that the jury failed to follow the court's instruction to disregard Dr. Goldstein's calculation arrived at by using a 4.4 percent growth rate.[5] That figure was $1,035,000.81. The

4. The plaintiffs still maintain that this ruling was incorrect, but the correctness of striking the growth rate figure is not a question that has been raised on these motions. The court's reason for disallowing the use of any growth rate figure was its view that the 2.5 percent discount figure was sufficient to account for the reasonably predictable economic changes which would affect future earnings. A growth rate factor might be proper in the case of a person who had

established a work record, but it would infuse too much speculation into the calculus in a case involving an infant. Tr. pp. 963–975.

5. The defendant refers to the 4.4 percent growth rate as "erroneous." Defendant's Brief, · Item 215, at p. 32. The court never ruled that this figure was erroneous. The court ruled only that no growth rate figure would be used.

amount awarded by the jury was less than half that figure. That the jury exceeded Goldstein's figure does not render the award invalid. The jury was free to consider factors such as Iain's family background, and it was instructed accordingly. There was evidence in the case that Iain was a bright boy. Also, Iain's parents were devoted to him to an extraordinary degree. The years of seemingly hopeless brain patterning therapy are testimony to that. Dr. Goldstein testified that the average yearly income for Canadian college graduates was $12,300. Tr., pp. 911–12; 990–91. He also said that a college graduate could be expected to begin work at age 22 and continue until age 65. However, the jury was not confined to these parameters.

Application of the 2.5 percent discount rate to a stream of income traversing a 43-year period (*i.e.*, ages 22–65) and arriving at a present value figure of $500,000 requires a yearly income much greater than that of the average college graduate described in Dr. Goldstein's testimony.[6] However, the jury could have determined that Iain would have had a higher-than-average income and that his earning power would increase from year to year. The court's disallowance of Dr. Goldstein's use of a 4.4 percent annual growth rate in his calculation did not prevent the jury from considering the possibility that Iain's earning power would increase over time.

The court declines the defendant's invitation to speculate that the jury did not follow the court's instruction to disregard Dr. Goldstein's calculation, based upon the use of the 4.4 percent growth rate, that the present value of Iain's future lost income is $1,035,000.81. The difference between that figure and the jury's verdict is so great that such speculation is clearly unwarranted.

 The jury's award was not against the weight of the evidence, and therefore, the court will not order a new trial on this issue. The court also will not employ the device of remittitur to reduce the jury's verdict. In a proper case, the court may compel a plaintiff to choose between reducing an excessive verdict or trying the case anew. *Shu-Tao Lin v. McDonnell Douglas Corp.*, 742 F.2d 45, 49 (2d Cir.1984). However, this device is properly used only when the jury's verdict is "grossly excessive." *Akermanis v. Sea-Land Service, Inc.*, 688 F.2d 898, 903 (2d Cir.1982), *cert. denied*, 461 U.S. 927, 103 S.Ct. 2087, 77 L.Ed.2d 298 (1983). That is not the case here.

### 3. *Future Medical Care*

The jury awarded $800,000.00 to Iain for future medical expenses. Dr. Goldstein testified that the present value of Iain's future medical expenses was $1,574,772.03. The jury's award to Iain on this item of damages was $800,000. Tr., p. 906. Dr. Goldstein testified to this figure in response to a long, hypothetical question (Tr., 899–901) which the court allowed him to answer over the defendant's objection. Before allowing the witness to answer, the court reminded the jury that the facts stated in the hypothetical question were for the jury to determine.

> If you find that—in any particular, that the assumption ... as to any point is not supported by the evidence, then you will discount or disregard the witness's answer ... to that extent.

Tr., p. 903.

 Hypothetical questions must include facts supported by the evidence. *Iconco v. Jensen Construction Co.*, 622 F.2d 1291, 1301 (8th Cir.1980). I have reviewed the testimony of Dr. Goldstein, as well as that of Iain's parents and Dr. William McIntyre. Dr. McIntyre was Chief of

---

**6.** Using the 2.5 percent discount rate, the present value of $1.00 a year for 43 years is $26.1166. *Financial Compound Interest and Annuity Tables,* Sixth Ed., Charles H. Gushee (ed.), Financial Publishing Co. (Boston, MA 1980), p. 1497. To arrive at a present value figure of $500,000, an average annual income of $19,144.91 is required. If the same discount rate is applied to the income level suggested by Dr. Goldstein ($12,300 for college graduates), the present value of future lost wages works out to $321,234.18.

the Division of Orthopedic Surgery at Children's Hospital of Eastern Ontario. Tr., 346. I find that the facts assumed in the hypothetical question asked by plaintiff's attorney have a substantial basis in the facts stated in the testimony of Iain's parents and Dr. McIntyre. *See, e.g.,* Tr., pp. 356–63 (testimony of Dr. McIntyre). For this reason, I find no basis in defendant's suggestion that Dr. Goldstein's estimates regarding future medical costs (Tr., pp. 916–920) were unwarranted. The level of care reflected in these estimates was sufficiently justified by other evidence in this case. The opinion of an expert may be based upon facts made known to him at trial. Fed.R.Evid. 703. The expert's opinion had a sufficient evidentiary basis, and the hypothetical question did not include extraneous facts that were not in evidence.

The jury's verdict of $800,000 was just over one-half of the $1,574,772.03 figure given by Dr. Goldstein. This verdict indicates that the jury did not accept Dr. Goldstein's testimony at face value. It also indicates that the jury followed the court's instruction. The award on this item of damages is supported by the evidence, and the court declines to upset it.

## V.

### Conclusion

To summarize and repeat: the plaintiff's motion to add Margaret Cunningham as a party plaintiff is granted. The amendment shall relate back to the date of the original complaint. The jury's verdict on the matter of damages for services rendered to Iain by his parents shall not be modified, and the defendant's motion for a new trial is denied.

So ordered.