The State of NEW YORK, Plaintiff,

v.

SOLVENT CHEMICAL COMPANY, INC., ICC Industries, Inc., Defendants.

No. 83–CV–1401C.

United States District Court, W.D. New York.

July 22, 2002.

Jaeckle, Fleischmann & Mugel, LLP, (Dennis P. Harkawik, and Brenda J. Joyce, of counsel), Buffalo, NY, for Solvent Chemical Company, Inc.

O'Brien & White, P.C., (Mark A. White, of counsel), Boston, MA, for Recochem and Joseph Kuchar.

## INTRODUCTION

CURTIN, District Judge.

Presently before the court are six motions related to a third-party action brought pursuant to the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601, *et seq.* Third–Party Plaintiff Solvent Chemical Company, Inc. ("Solvent") has moved for summary judgment seeking liability under CERCLA against third-party defendants Recochem, Inc., and Joseph Kuchar, individually (collectively "Recochem" or "defendants"). Item 996. Recochem and Kuchar, in turn, have filed a cross-motion for summary judgment against Solvent, Item 1013; a motion to strike the affidavit of Solvent's expert, Dr. E. Bruce Nauman, Item 1016; a motion to strike Dr. Nauman's Report and Testimony, Item 1017; a motion to strike the affidavit of Brenda Joyce, Esq., one of the attorneys for Solvent, Item 1019; and a motion for sanctions, Item 1022.

Oral argument on these motions took place on January 16, 2002. For the reasons that follow, Solvent's motion for summary judgment is denied; Recochem and Kuchar's cross-motion for summary judgment is denied; and Recochem and Kuchar's motions to strike (a) the affidavit of Dr. Nauman, (b) the Report and testimony of Dr. Nauman, and (c) the Joyce affidavit, are denied. In addition, defendants' motion for sanctions is denied.

## BACKGROUND

In 1983, the State of New York (the "State") brought an action against, *inter alia,* Solvent pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), "seeking recovery of costs incurred and to be incurred, and other relief, in responding to the release or threatened release of hazardous substances at or in connection with the property located at and near 3163 Buffalo Avenue, Niagara Falls, New York. . . ." Item 1000, Ex. 3, p. 2. In December 1996, the State issued a Record of Decision ("ROD") identifying a number of hazardous substances in the soil and ground water at the Buffalo Avenue site (the "site") and calling for specific remedial activities to be undertaken there. Item 1000, Ex. 1. Among the contaminants identified in the ROD were various dicholorobenzenes[1]. *Id.,* pp. 10–11. Several of the dicholorobenzenes are listed as hazardous substances pursuant to § 101(14) of CERCLA, 42 U.S.C. § 9601(14). Item 1000, Ex. 2.

In April 1997, Solvent and the State entered into a Consent Decree, in which Solvent agreed to implement the remedy set forth in the ROD. Item 1000, Ex. 3. The Consent Decree was approved by this court on October 8, 1997. Item 655. It reserved Solvent's right to seek contribution against other non-settling parties. Item 1000, Ex. 3, ¶ 47. It also provided that the remedial actions to be undertaken to clean up the site should be conducted in compliance with applicable provisions of CERCLA and the National Contingency Plan, 40 C.F.R. Part 300. Item 1000, ¶ 6.

Solvent then proceeded to file third-party actions seeking, *inter alia,* statutory contribution under CERCLA against other alleged owners, operators, transporters, and those who arranged for disposal at the site. It asserts that it has already incurred over $4.4 million in response costs at the site, and anticipates that it will incur over $20 million in total response costs. *Id.,* ¶¶ 6, 7. At oral argument, Solvent's

---

**1.** Among the organic contaminants found in the soils and both the overburden and bedrock groundwater were 1,2–dichlorobenzene ("ortho-dichlorobenzene"), 1,3–dichlorobenzene ("meta-dichlorobenzene"), and 1,4–dichlorobenzene ("para-dichlorobenzene"). Item 1000, Ex. 3, pp. 10–11.

counsel stated that remediation of the site is complete, at a cost of $5.3 million dollars so far.

On April 3, 1998, in its Fifth–Amended Third–Party Complaint, Solvent impleaded Record Chemical[2] and Joseph Kuchar, as third-party defendants, seeking contribution from each of them under CERCLA for a share of the response costs Solvent has and will incur at the site. Item 1000, Ex. 4. The Complaint charged Recochem and Kuchar, and a number of other "Chlorinated Benzene Waste Generators" with selling/providing Chlorinated Benzene Waste materials to Solvent which could not be used unless they were further processed. *Id.*, ¶¶ 142, 144. Solvent charged that by providing this material to Solvent, the Chlorinated Benzene Waste Generators "arranged for the disposal of and/or treatment of the . . . Chlorinated Benzene Wastes and any hazardous substances contained therein." *Id.*, ¶ 143. Further, Solvent claimed that if the generators had not provided these wastes to Solvent, "they would have had to otherwise treat or dispose of them." *Id.*, ¶ 145. In their answer, Recochem and Kuchar raised as an affirmative defense that the sale of the chlorinated benzene material to Solvent constituted sale of a "valuable and useful produc[t]" rather than an "arrange[ment] for 'disposal'" pursuant to CERCLA. Item 1000, Ex. 5, p. 19.

The cross-motions for summary judgment primarily concern whether the sales of chlorinated benzene material by Recochem to Solvent were arrangements for treatment or disposal under CERCLA—which would be an element of CERCLA liability—or sales of a useful product—which would obviate CERCLA liability.

## FACTS

Many of the facts in this case are undisputed. However, the parties contest how those facts are characterized. Solvent relies on documentary evidence and testimony in support of its motion, while the Recochem defendants rely solely on deposition testimony and affidavits, without document backup. Counsel for Recochem states that the company "did not save documents from 25 years ago." Item 1068, p. 8.

From 1973 until 1977, Solvent operated a chemical manufacturing facility at the 3163 Buffalo Avenue site. Item 1000, Ex. 1, p. 1. Its "principal products of manufacture were various technical and refined grades of chlorinated benzenes and zinc chloride solution." Item 998, ¶ 9. In 1974, Solvent President Bertram White described Solvent's operations as

> process[ing] impure Paradichlorobenzene and purify[ing] same by crystallization, then we proceed to solidify the end product and grind and screen same for shipment.
>
> Our end product is equivalent to that of every basic manufacturer but we do not produce the raw material which originates from a reaction of Chlorine and Benzene and then a distillation procedure.

Item 1049, Ex. F. Solvent characterized its "niche" as "purchas[ing] off-specification or low-purity chlorinated benzene material from other manufacturers and distill[ing] or otherwise re-work[ing] this off-specification material to make it into one of the recognized saleable grades of chlorinated benzene." Item 998, ¶ 10; Muzyka Dep., Item 1000, Ex. 8, p. 28. Once Solvent processed the material, the residues and impurities removed during the reprocess-

---

**2.** During the relevant time period at issue, Recochem was known as Record Chemical.

The company changed its name in 1980 to Recochem. Item 1000, Ex. 12, pp. 6–7.

ing were disposed off-site. *Id.*, pp. 39, 155, 185.

### 1. *The Production Process*

As explained by Solvent's expert, Dr. E. Bruce Nauman, chlorobenzenes "are formed by the reaction of chlorine with benzene." Item 997, ¶ 12. The transactions between Solvent and Recochem involved three isomeric forms of dichlorobenzenes: 1,2–dichlorobenzene ("ortho-dichlorobenzene"); 1,3–dichlorobenzene ("meta-dichlorobenzene"); and 1,4–dichlorobenzene ("para-dichlorobenzene"). Obtained during the benzene chlorination process, the three dichlorobenzenes have "different properties, markets and prices." *Id.*, ¶ 13. In a typical benzene chlorination process, para-dichlorobenzenes ("para") would constitute approximately 40 percent of the mixed dichlorobenzenes produced, and ortho-dichlorobenzenes ("ortho") would constitute approximately 60 percent of the mixed dichlorobenzenes produced. Meta-dichlorobenzene ("meta") would constitute less than 1 percent of the mixed dichlorobenzenes produced. *Id.*, ¶¶ 14–16. According to Dr. Nauman, para is the ingredient of mothballs and can be used as a chemical intermediate; ortho is used as a solvent, disinfectant, and chemical intermediate. Meta has "no significant markets and is not recovered as a purified material in a typical benzene chlorination process." *Id.*, ¶ 16.

Utilizing a process flow diagram as well as the testimony of Recochem employees, Dr. Nauman described Recochem's production process as consisting of

a two-step process to treat a feed stream of mixed dichlorobenzenes. In the first step, para-dichlorobenzene was crystallized as relatively pure product.

There was a liquid residue, commonly called 'mother liquor' that results from the crystallization....

The second step ... was distillation of the mother liquor from the first step. The purpose of this distillation was not to separate the various dichlorobenzenes but instead was to remove tars and other high boiling impurities. The overhead product from the distillation column was nominally ortho-dichlorobenzene, but in fact contained whatever quantities of para- and meta-dichlorobenzene were in the mother liquor.

Item 997, ¶¶ 22, 23.[3]

Recochem "processed and sold chlorinated benzene products...." Item 1014, p. 4. Its major objective was to purify para, although it also "sold various grades of Orthodichlorobenzene" which varied from 50 percent to 80 percent pure. Carmichael Dep., Item 1000, Ex. 12, p. 21. Recochem's "normal target" of ortho purity was 70 percent, *id.*, p. 82, although it had markets for lower percentage ortho products. According to Ralph Carmichael, Vice President of Recochem, "the majority of the sales [of ortho] would have been in a range of sixty (60) to probably seventy, seventy-five (70–75) [percent], that was what our unit was capable of producing on a regular basis." *Id.*, pp. 22–23. He noted that "in the degreaser, carbon removal, solvent application, [certain companies] did not have any very strict specifications of Ortho quality, Ortho percentage. All they really wanted was a clean liquid product that was a good solvent...." *Id.*, p. 83. He could not recall which companies purchased Ortho in the 50 to 59 percent range. *Id.*, p. 22.

Once the material arrived at the Solvent site, Solvent would upgrade it by various

---

**3.** The Recochem defendants object to this characterization on the basis that "Dr. Nauman has no experience in the manufacture of dichlorobenzenes." Item 1016, pp. 4, 5.

methods, including: "filtration to remove dirt, washing with sodium hydroxide to remove color, distillation to remove contaminants and to change isomer ratios to standard values, and blending to change isomer ratios to standard values (e.g. blending 60% ortho-dichlorobenzene with 99% ortho-dichlorbenzene to obtain technical grade ortho-dichlorobenzene of 80+% purity)." Item 997, ¶ 27.

Concerning whether Recochem disposed of any of the lower grade materials it produced, the Carmichael deposition testimony went as follows:

Q: And your testimony is that there were absolutely no wastes, no mixed dichlorobenzenes, no Para and no Ortho that had to be disposed of by Record Chemical or ... and I'm talking, when I say Record Chemical, by Chemical Refineries [4]?

A: No, we were able to utilize the lower grade products, we were able to formulate them into finished products that were ... that met certain requirements, you know, for their applications.

Mr. MARK A. WHITE: [5]

I [j]ust wonder, can I talk to you for one second?

(OFF THE RECORD)

A: Yes, what we ... for the lower qualities material, we formulated those into specialty degreasers that were sold in the market. Our ... or what we produced not all the time matched the demand for these types of products. So we had a build-up of inventory of the lower grade product, and eventually we would have, to balance our inventories or to keep the tank at a reason-

able level, we would have had it disposed of.

.   .   .   .   .

Q: Okay. So occasionally there would be a disposal of some of the lower grade products?

A: Yes

Q: Because you had more than you could sell?

A: More than what the market demand was.

Q: And do you know how that would have been disposed of?

A: I wasn't involved, that wasn't my responsibility, but it would have been disposed of through the disposal, waste disposal companies....

Item 1000, Ex. 12, pp. 23–24.

Upon further questioning, Mr. Carmichael stated:

A: We may not have disposed of material in the seventies ('70s), I'm not sure when, but it doesn't, you know, we were not disposing on a regular basis. Because it was only a small ... what was left over was only a small portion of the production. So we would have kept going, we could have only disposed in the eighties ('80s), I don't know.

Q: Okay. And when you say lower grade, what are you talking about roughly in terms of the percentages of Ortho?

A: It wasn't so much the percent Ortho, it was really a color issue: what was left over was a very black, very dark black product, and that's why we were limited in how much we could formulate into a saleable product because of color.

---

4. Chemical Refineries Corp. operated a plant which produced the chemicals Recochem sold. Item 1047, Ex. 2, p. 15.

5. Recochem counsel, Mark White.

Q: I see. And how dark would it have to be before you could no longer really use it?

A: Black. We could use the black product, but only to a certain degree of what the demand was for those formulated products.

Q: What could black product be used for?

A. Just a, usually a emulsified orthodichlorobenzene would have been used in some degreasing, carbon removal, sometime into septic tanks or outside parks, outside toilets, those type of things they use for disinfection.

Item 1047, Ex. 2, pp. 25–26.

Recochem had a relationship with Chemicals Refineries Corporation, which had a plant in Napierville, Quebec, and which "operated as a producer, as a production site." *Id.*, p. 15. The commercial activities, *i.e.*, sales of the chemicals, "were done under the name of Record Chemical." *Id.*

## 2. *Sales Between Recochem and Solvent*

Solvent and Recochem entered into a written contract dated September 23, 1976, which governed both "Straight Sales" from Recochem to Solvent and a "Tolling Arrangement," whereby Solvent supplied Recochem with "stream crude dichlorobenzene," which Recochem processed and returned to Solvent along with additional material. Item 1000, Ex. 13. By way of the contract, Recochem agreed to supply 300,000 pounds of paradichlorobenzene at $.20/lb., and 850,000 pounds of orthodichlorobenzene of 70 percent quality, at $.18/lb, to Solvent. Pursuant to the tolling arrangement, Solvent agreed to supply Recochem with 823,000 pounds of "stream crude dichlorobenzene." Recochem would process the stream and return

it to Solvent, consisting of 66 percent orthodichlorobenzene. Item 1000, Ex. 13.

Once the Recochem materials arrived at the Solvent site, Solvent would analyze them and treat them. This treatment, according to Henry Muzyka, a Solvent plant manager, involved "[s]ometimes just removal of a color; otherwise, it was just distillation and sometimes just blending off." Item 1000, Ex. 8, p. 29. By this process, Solvent sought to remove impurities from the material "to clean it up." *Id.*, p. 46.

Solvent has calculated that Recochem sold approximately 2.7 million pounds of mixed dichlorobenzene materials to Solvent as straight sales between January 1976 and Sept. 8, 1977. Item 1000, ¶ 25, and Ex. 20. As part of the tolling arrangement, instead of the 823,000 pounds referred to in the contract, Solvent sent four shipments of dichlorobenzene materials to Recochem, totaling 429,140 pounds. Recochem processed this material to approximately 300,698 pounds of ortho, and added 300,000 pounds of its own ortho, to bring the total amount shipped back to Solvent to 600,398 pounds. Item 1000, Ex. 14. One Solvent employee observed that the materials returned to Solvent pursuant to the tolling arrangement contained four times as much meta. Item 1000, Ex. 17. Both Solvent and Recochem employees viewed meta as an undesirable isomer. *See* Item 1000, Ex. 25; Item 1047, Ex. 12, pp. 192, 195; Ex. 13, pp. 18–19. Another Solvent employee complained that the high meta content in the materials returned via the tolling arrangement did not originate in Solvent's raw material supplied to Recochem, but that Recochem had added someone else's "junk." Item 1000, Ex. 18.

Solvent eventually proposed to terminate the tolling part of the written contract. Kuchar, on behalf of Record Chem-

ical, agreed to this in a telegram dated April 4, 1977. Item 1000, Ex. 15.

### 3. Ownership/Operation of the Site

In late 1977, Recochem asserts that Solvent approached Recochem, Hydroclean, Inc., and Kuchar about purchasing the company, Item 1014, p. 8; Solvent states that Recochem and Kuchar began negotiations with Solvent to purchase Solvent's Niagara plant. Item 999, p. 8. Recochem maintains that Hydroclean, Inc., "the entity that would operate the company in the event of a purchase" conducted due diligence. *Id.* "For *one* week it observed the operation of the plant, particularly what the site was capable of producing. All activity was conducted by Solvent personnel." *Id.* Solvent, on the other hand, cites a January 3, 1978 telex sent by Kuchar to the employees at Solvent announcing that as of that day, the plant "will operate as H.C. Niagara Division" of Recochem. Item 1000, Ex. 36. Solvent has supplied additional documents indicating that "Recochem actively operated the plant at least through the end of January, 1978 (and possibly later), and that Kuchar was deeply involved in these operations." Item 1000, ¶ 39. *See* Item 1000, Exs. 37–41. During that time, chlorinated benzene material was released into the environment. Item 1000, Exs. 46–48.

### DISCUSSION

### I. The Parties' Arguments

The parties sharply disagree as to whether the mixed dichlorobenzenes provided to Solvent by Recochem constituted a commercially viable product, within accepted standards established in the industry, or whether the product constituted a waste stream. In CERCLA shorthand, this is described as the "product versus waste" issue, which lies at the heart of the cross-motions for summary judgment. Dr. Nauman, Solvent's expert, concludes that

"the material sent to Solvent by Recochem was not a product and required processing by Solvent to become a useful product." Item 997, ¶ 11. In support of his conclusion, Dr. Nauman identifies two grades of ortho: refined, which is "at least 98% pure," and a technical grade "that is at least 80% pure." *Id.*, ¶ 15. The technical grade is "essentially colorless." ¶ 20. He describes technical grade chemicals as follows:

> [They] generally represent intermediate streams in a chemical process that have not been subjected to final purification. They are items of commerce with established uses and with standards of identity that are understood by supplier and customer. Failure to meet these standards eliminates established markets for the products, although they could be sold at a substantial discount when the purchaser is willing to reprocess the materials.

Item 997, ¶ 18.

Solvent, through Dr. Nauman, seeks to show that ortho of lower than 80 percent purity is not a recognized product, must be further processed to be useful, and is therefore a waste, a position that Recochem disputes.

When describing the Recochem production process, Dr. Nauman concluded that the Recochem distillation column "yielded a material containing a maximum of about 70% ortho-dichlorobenzene. . . ." Item 997, ¶ 24. He asserted that because the ortho-dichlorobenzene supplied by Recochem to Solvent was less than 80 percent pure, it was not technical grade, and required "reprocessing and upgrading" in order to become a dicholorobenzene product. *Id.*, ¶ 30. In support of his conclusion that less than 80 percent ortho was not technical grade, he referred to the definition of technical grade ortho used in a trade magazine, the *Chemical Market Reporter,* and to

"marketing and technical materials generated by chlorinated benzene manufacturers." *Id.*, ¶ 19. He compiled a chart and supporting documentation which he appended to his affidavit as Exhibit C, indicating minimum specifications for technical grade ortho manufactured by several large chlorobenzene producers. The chart indicated an 80 percent minimum for the six chemical companies listed. Item 997, Ex. C. He also pointed out that Recochem sold the off- or non-specification mixed dichlorobenzenes to Solvent for "prices much below market prices that prevailed at the time." Item 997, ¶ 28. He cited the 1976 contract where Recochem sold ortho to Solvent at $.18 per pound, while the prevailing market price for technical grade ortho was $.30 to $.33 per pound. *Id.* He concluded, "[i]n my opinion, this low price reflected the need for substantial further processing and the disposal of contaminants before the material could be sold in normal commerce." *Id.*

The Recochem defendants dispute various aspects of Dr. Nauman's affidavit, particularly his conclusion that their distillation column could produce no more than 70 percent ortho, and that technical grade ortho had to be 80 percent pure. Recochem challenges as well the credibility and accuracy of the *Chemical Market Reporter,* and averred that the prices listed therein did not "fairly reflect market conditions. . . ." Item 1016, p. 3. To support its position, Recochem provided affidavits by (1) its expert, Al Lifson, (2) the former President of Solvent, Bertram White, and (3) Ralph Carmichael, Vice President of Recochem. According to Mr. Lifson, "the material sent to Solvent by Recochem was a chlorinated benzene product that could be used in the manufacture of other chlorinated solvents and products that contained chlorinated benzenes as their active ingredient. I would not classify this product as a waste product." Item 1026, p. 3. He added, "There is no minimum requirement

of purity for technical grade ortho-dichlorobenzenes. There is pure grade and technical grade. The percentage depends on the application. . . . Technical grade is any grade less than pure grade." *Id.*, p. 4. As an example of a product that contained less than the 80 percent 'technical grade' noted by Dr. Nauman, Mr. Lifson cited a product, Cloroben PT, emulsified ortho-dichlorobenzene, manufactured by Standard Chlorine, which had a specification of 70 percent ortho. *Id.*

Mr. Carmichael testified that Recochem's production unit was "only capable of reaching up to about an eighty percent (80%) ortho," Item 1047, Ex. 2, p. 57, not the "maximum of about 70% ortho-dichlorobenzene" which Dr. Nauman had indicated in his affidavit. Item 997, ¶ 24.

As Exhibit 20 attached to the Joyce affidavit, Solvent created a chart reflecting Recochem's "Straight Sales" of Mixed Ortho–Dichlorobenzene Shipments over the course of 1976 and 1977. The chart indicated the "Percent Ortho" of the material shipped, ranging from a low of 59.8 percent to a high of 81.2 percent, with the great majority of shipments falling within the 65 to 78 percent range. Item 1000, Ex. 20.

## II. Legal Standards

### A. Standard for Summary Judgment

Federal Rule of Civil Procedure 56(c) provides that a motion for summary judgment shall be granted if the pleadings and supplemental evidentiary materials "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Morales v. Quintel Entertainment, Inc.,* 249 F.3d 115, 121 (2d Cir.2001), *citing Anderson v. Liberty Lob-*

*by, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Under the rule, the burden is on the moving party to inform the court of the basis for its motion and to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). After the moving party has carried its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "[T]he non-moving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Id.* at 587, 106 S.Ct. 1348 (*quoting* Fed. R.Civ.P. 56(e)). When perusing the record to determine whether a rational fact-finder would find for the nonmoving party, "a court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party." *Sorlucco v. New York City Police Department,* 888 F.2d 4, 6 (2d Cir.1989). The court's function "is not ... to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

> [E]ven when both parties move for summary judgment, asserting the absence of any genuine issues of material fact, a court need not enter judgment for either party. Rather, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration.

*Morales,* 249 F.3d at 121 (citations omitted).

**B. Standard for CERCLA Liability**

■ CERCLA is a broad, remedial statute enacted by Congress in 1980 "designed to enhance the authority of the EPA to respond effectively and promptly to toxic pollutant spills that threaten the environment and human health." *Mainline Contracting Corp. v. Chopra–Lee, Inc.,* 109 F.Supp2d 110, 117 (W.D.N.Y.2000), quoting *B.F. Goodrich Co. v. Murtha,* 958 F.2d 1192, 1197 (2d Cir.1992). CERCLA ensures " 'that those responsible for any damage, environmental harm, or injury from chemical poisons bear the costs of their actions.' " *General Electric Co. v. AAMCO Transmissions, Inc.,* 962 F.2d 281, 285 (2d Cir.1992), quoting S.Rep. No. 848, 96th Cong., 2d Sess. 13 (1980), U.S.Code Cong. & Admin.News 1980, 6119, reprinted in 1 CERCLA Legislative History at 320. As a remedial statute, CERCLA is to be liberally construed to give effect to its purposes. *Schiavone v. Pearce,* 79 F.3d 248, 253 (2d Cir.1996).

CERCLA "addresses in particular the costs of responding to the release or threatened release of 'hazardous substances', as that term is defined by CERCLA § 101(14) (42 U.S.C. § 9601(14))." *Prisco v. A. & D. Carting Corp.,* 168 F.3d 593, 603 (2d Cir.1999). In that regard, CERCLA provides that a private right of action may be brought to recover such costs from anyone who falls within one of four specific categories of potentially responsible parties set forth under § 107. *Id.* at 602 (citing 42 U.S.C. § 9607).

■ To establish a prima facie cause of action under CERCLA, Solvent must demonstrate (1) the defendants are responsible parties as defined under § 9607(a); (2) the site is a facility as defined in § 9601(9); (3) the release or threatened release of hazardous substances at the facility; (4) that it incurred response costs in connection with the release; and (5) the cost incurred and response actions taken conform to the National Contingency Plan ("NCP") established under the CERCLA and administered by the EPA. *See Mainline Contract-*

*ing Corp.,* 109 F.Supp.2d at 117. Upon establishing these elements, the defendant is then strictly liable for the release or threatened release of hazardous substances unless it successfully invokes one of the statutory defenses set forth under 42 U.S.C. § 9607(b).

Here, Recochem and Kuchar do not challenge the fact that Solvent is a "facility," that hazardous substances have been released at the site, or that response costs have been incurred. Item 1014, pp. 8–9. Although the Recochem defendants do not concede that the response costs have been consistent with the NCP, *id.,* p. 9, the issues raised in the cross-motions for summary judgment concern whether the defendants qualify as responsible parties. Defendants also dispute the liability of Joseph Kuchar individually.

## III. Motions to Strike

Since the resolution of Recochem's motions to strike the affidavit of attorney Brenda Joyce, Item 1019, and the affidavit and report of Dr. E. Bruce Nauman, Item 1016, would have a bearing upon what the court considers in its assessment of the cross-motions for summary judgment on the issue of CERCLA liability, the court will address the motions to strike first. In addition, without making a formal motion, Recochem has asked the court to strike the Joyce reply affidavit as well. Item 1067, p. 5.

### A. The Legal Standard

Rule 12(f) allows the court to "order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed.R.Civ.P. 12(f). "[M]otions to strike are not favored and will be denied unless the allegations have no possible relation to the controversy.... If there is any doubt whether the challenged matter may raise an issue of fact or law, the motion to strike should be denied." *In re NASDAQ Mar-*

*ket–Makers Antitrust Litigation,* 164 F.R.D. 346, 350 (S.D.N.Y.1996) (quotation omitted). To prevail on a motion to strike, defendants must show that "it is clear that the challenged matter has no bearing on the subject matter of the litigation and that its inclusion will prejudice the defendants." *Id.* (quotation and citations omitted). *See Metrokane, Inc. v. Wine Enthusiast,* 160 F.Supp.2d 633, 641–42 (S.D.N.Y. 2001).

### B. Motion to Strike the Joyce Affidavit

The Recochem defendants move to strike the entire affidavit of attorney Brenda Joyce on the ground that she "has no personal knowledge of the facts contained therein," Item 1019, p. 1, and "sets forth facts inadmissible in evidence." Item 1020, p. 2. In their motion papers as well as in their response to the Joyce reply affidavit, Item 1067, they specify, paragraph by paragraph, what they find objectionable. Among their objections are: Joyce's characterizing and misstating testimony, *id.,* p. 2; using vague terms, *id.,* p. 6; providing opinion, *id.,* p. 7; being incorrect, *id.;* attempting to summarize facts, *id.,* p. 9.; being conclusory, *id.* In their reply affidavit, Item 1067, the Recochem defendants contend that the Joyce Affidavits violate Fed.R.Civ.P. 56, because when considering motions for summary judgment, "Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Rule 56(e). Because the "Joyce Affidavit meets none of these requirement[s]," the Recochem defendants argue that it should be stricken. Item 1067, p. 4.

Based on the standard set forth in Rule 12(f), this court will not strike the Joyce

affidavit, Item 1000, or reply affidavit, Item 1047, as it does not find the material contained therein either redundant, immaterial, impertinent, or scandalous. Many of the Recochem defendants' objections relate to the merits of the claims at issue, which is not a proper basis for a motion to strike. Even if some of their objections that certain items are misquoted, not completely quoted, or otherwise mischaracterized, are correct, that will not prejudice this court. The court will peruse the documentary evidence and draw its own conclusions based on that evidence, not based upon an attorney's characterizations of it. *See In re NASDAQ Market–Makers Antitrust Litigation,* 164 F.R.D. at 350.

■ Concerning the Recochem defendants' objection to the Joyce affidavits based on Rule 56, the rule is that if an attorney's affidavit contains factual assertions not made upon personal knowledge and/or legal arguments, such portions of the affidavit would not be considered by the court in connection with the pending motion for summary judgment. *Ditullio v. Village of Massena,* 81 F.Supp.2d 397, 403 (N.D.N.Y.2000). However, the court does not find that is the case here. Both the affidavit and reply affidavit are made "on the basis of my personal knowledge of the matters stated, or on the basis of Court papers, discovery or other documents in this proceeding." Item 1000, ¶ 1; Item 1047, ¶ 1.

In her affidavits, Ms. Joyce is not testifying as to facts at issue in this case. Her affidavits are vehicles placing before the court relevant, admissible documents and the relevant portions of sworn testimony of witnesses with personal knowledge. Given the complexity of this case, and the numerous documents and many pages of testimony that have been generated during the discovery process, Ms. Joyce's affidavits present the evidence in a cohesive manner. See *Moore's Federal Practice*

§ 56.14[1][c], p. 56–160. The documents attached to the Joyce affidavits were created as part of the litigation (*e.g.,* discovery materials), with which attorney Joyce is familiar. In addition, the court agrees with Solvent that the case law pillar of the summary judgment standard, *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), allows a degree of attorney characterization in its instruction that a party explain the basis for its motion and identify the relevant evidence supporting its evidence. *Id.* at 323, 106 S.Ct. 2548.

On the basis of the foregoing, the court denies the Recochem defendants' motion to strike the Joyce affidavit. Item 1019. Nor will it strike the reply affidavit. Item 1067.

### C. Motion to Strike the Nauman Affidavit

The Recochem defendants have moved to strike the affidavit of Solvent's expert, Dr. E. Bruce Nauman. Item 1016. In their memorandum of law in support of the motion, they also ask the court to prohibit (1) the identification of Dr. Nauman as an expert on plaintiff's behalf at trial; (2) the plaintiff from supplementing its answers to interrogatories requesting the identification of an expert; and (3) the admission of Dr. Nauman's testimony at trial. Item 1017, p. 1. In the caption of their memorandum of law, the Recochem defendants additionally seek to strike Dr. Nauman's Report. *Id.*

The Recochem defendants argue that Dr. Nauman's Report, as well as his designation as an expert witness by Solvent, "does not pass the standard set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 591, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)...." Item 1017, p. 2. Further, "the opinions expressed by Dr. Nauman are entirely without foundation,

speculative, based on no special expertise of the purported expert, and irrelevant to the issue at hand." *Id.*, p. 3. They point out that because Dr. Nauman never marketed or sold chlorobenzenes, has no personal familiarity with their price, and never published, lectured or taught a course on chlorobenzenes, he is not qualified. *Id.*, pp. 10–11. Defendants argue that because Dr. Nauman is unqualified, his conclusions lack foundation, are unreliable, and will thus not be helpful to the court.

Solvent counters that Dr. Nauman's credentials reveal "significant experience with the production, marketing and disposal of bulk chemicals and materials that clearly qualifies him to render an opinion on the processes that generate chlorinated benzenes and the supply and balance considerations that go into disposition of such materials as products or wastes." Item 1048, p. 35. Solvent argues that the fact that Dr. Nauman has never marketed, sold or set prices for chlorobenzenes is irrelevant, "given that Dr. Nauman need not have engaged in these specific activities to qualify as an expert in this case." *Id.*, p. 36. Solvent also asserts that Dr. Nauman's opinion is reliable and relevant, and the Recochem defendants' argument that his testimony must be stricken for failing to comply with the factors set forth in *Daubert* is baseless. *Id.*, pp. 40–41.

### 1. Expert testimony

The Federal Rules of Evidence permit opinion testimony by experts when the witness is "qualified as an expert by knowledge, skill, experience, training, or education...." Fed.R.Evid. 702. The witness may then give opinion testimony relating to "scientific, technical, or other specialized knowledge" if it will "assist the trier of fact to understand the evidence or to determine a fact in issue...." *Id.* Under *Daubert*, the court is charged with making a "preliminary assessment of whether the reasoning or methodology un-

derlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592–93, 113 S.Ct. 2786. The trial court is thus vested with the role of "gatekeeper," ensuring that any scientific testimony admitted is both reliable and relevant. *Id.* at 589, 597, 113 S.Ct. 2786. Courts will first examine a purported witness's qualifications, then examine whether his testimony is reliable pursuant to Fed.R.Evid. 702.

### a. Dr. Nauman's Qualifications

The Second Circuit has construed expert qualification requirements liberally. "Liberality and flexibility in evaluating qualifications should be the rule ... the expert should not be required to satisfy an overly narrow test of his own qualifications." *Bunt v. Altec Indus., Inc.*, 962 F.Supp. 313, 317 (N.D.N.Y.1997) (quotation omitted). "Accordingly, assuming that the proffered expert has the requisite minimal education and experience in a relevant field, courts have not barred an expert from testifying merely because he or she lacks a degree or training narrowly matching the point of dispute in the lawsuit." *Canino v. HRP, Inc.*, 105 F.Supp.2d 21, 27 (N.D.N.Y.2000) (citations omitted).

Dr. Nauman holds both M.S. and Ph.D. degrees in Chemical Engineering. Item 997, ¶ 2. He has been a professor of Chemical Engineering at Rensselaer Polytechnic Institute ("RPI") since 1981. *Id.*, ¶ 3. His expertise is in chemical reaction engineering, *id.*, ¶ 5, and he asserts that benzene chlorination is an example of a chemical reaction system. Item 1049, p. 55. He has authored books which discuss chlorinated benzenes as examples of reaction mechanisms. Item 1049, pp. 43–44, 54. For thirteen years prior to his academic career, Dr. Nauman worked as Product Manager at Union Carbide Corp. Item

997, ¶ 4. His responsibilities included "product definitions, specifications, pricing and manufacturing schedules for a business complex that utilized monochlorbenzene." *Id.* He has set and negotiated product specifications and prices, and negotiated distributor discounts. *Id.*, ¶ 8. He asserts that the skills required as Product Manager, "at least for high volume petrochemicals like the chlorobenzenes pertinent to this case, are largely independent of the specific chemicals being sold." Item 1049, ¶ 6. At RPI, he has conducted research involving product specifications and market assessments. *Id.*, ¶ 9. As an independent consultant, he has also undertaken a number of marketing assignments. *Id.*

The Recochem defendants have not challenged Dr. Nauman's qualifications on the basis of inadequate education in chemical engineering. Rather, they argue that he should not be classified as an expert because he has no experience in marketing chlorobenzenes. As outlined above, however, courts have not required such narrowly tailored specialization in assessing an individual's qualifications as an expert. *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir.1995). The process involving chlorinated benzenes in this case involves chemical reactions, and thus fits within Dr. Nauman's expertise and experience, which he has gained from his positions in both academe and the chemical industry. The Recochem defendants claim that, among Dr. Nauman's myriad failings, he had no experience with emulsified dichlorobenzene, or that he was wrong when he stated that trichlorobenzene is used as a degreaser. Item 1069, pp. 8–10. The Second Circuit has stated that disputes as to the strength of the expert's credentials, training, or knowledge on specific points "may properly be explored on cross-examination at trial and thus go to the weight and credibility of the expert's testimony,

not admissibility." *Canino,* 105 F.Supp.2d at 28.

The court finds that Dr. Nauman's knowledge, experience, training, and education render him sufficiently qualified as an expert to offer his opinion regarding the product-versus-waste controversy in this case.

### b. Relevance, Reliability, Helpfulness

Having determined that Dr. Nauman is qualified to testify as an expert, the court's next "gatekeeping" inquiry is to determine whether the expert's proposed testimony involves (1) scientific knowledge that (2) will assist the trier of fact to understand the evidence or determine a fact in issue. Rule 702; *Bunt,* 962 F.Supp. at 317.

The federal rules are weighted on the side of admissibility when analyzing whether an opinion constitutes scientific knowledge. *Canino,* 105 F.Supp.2d at 28 (citing cases). Testimony under Rule 702 is reliable where "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed.R.Evid. 702. The court finds that these elements of admissibility have been satisfied by Dr. Nauman as well. Dr. Nauman's testimony is based upon his extensive experience as a chemical engineer. His Expert Report, Item 1049, Ex. A, sets forth in detail the data and other information he has considered in the formation of his opinions while his affidavit, Item 997, sets forth that information in general. The sources appear to be reputable and authoritative, and were culled from his own research (as opposed to being provided by Solvent's attorneys). He has perused evidence produced by the parties, deposition transcripts, literature on chlorobenzene manufacturing processes and product pricing,

and his own publications. Item 997, ¶ 10; Item 1049, Ex. A, ¶ 10.

Dr. Nauman has applied that information to directly address the "product versus waste" issue, around which this case revolves. His report and affidavit explain his analysis of the chlorobenzene manufacturing process applied to the facts of this case. Item 1049, Ex. A, ¶ 11(a). Any alleged inaccuracies in his affidavit, report, or deposition identified by Recochem should be tested in the crucible of cross-examination.

Recochem insists that Dr. Nauman's formulation of the issues in this case is incorrect, and that his conclusions will not assist the trier of fact because they are, simply, wrong. Item 1016, pp. 3–4. But Recochem's disagreement with Dr. Nauman's conclusions do not make Solvent's expert irrelevant pursuant to Rule 702. The court finds that Dr. Nauman's opinions on "whether the chemicals ... provided by Recochem to Solvent were commercially recognized finished products or waste streams," Item 1048, p. 37, are helpful in its assessment of the facts. The court finds Recochem's arguments have no merit, finds Dr. Nauman qualified, and his testimony relevant, reliable, and helpful.

#### c. *Daubert* Objections

The Recochem defendants have also argued that Dr. Nauman's testimony should be stricken because it did not satisfy the *Daubert* factors. Item 1017, p. 2. While *Daubert* provides a non-exhaustive list of specific factors against which a court may assess whether evidence is reliable, numerous courts, including the Supreme Court, have indicated that, particularly in cases where methodology and technique and new scientific methods are not involved, the *Daubert* test may not necessarily apply. See *Bunt,* 962 F.Supp. at 317 n. 3. *See also Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 141–42, 119 S.Ct. 1167, 143

L.Ed.2d 238 (1999) (*"Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case."). The *Daubert* factors are not necessary to be met here, because this case does not present issues of "junk" science or involve new scientific methods.

The court agrees with Solvent that the *Prohaska* and *Mancuso* cases, cited by Recochem, are inapposite. In *Prohaska,* this court excluded expert testimony because the proffered expert's application of the scientific methodologies upon which his testimony was based was fraught with error. *Prohaska v. Sofamor, S.N.C.,* 138 F.Supp.2d 422, 438–42 (W.D.N.Y.2001). In *Mancuso,* the expert's testimony was excluded because of his lack of formal training and credentials, his inability to answer questions about the specific issues in the case, his reliance on plaintiffs' attorney to provide him with scientific literature, and his conclusions on causation were based on a fundamentally flawed methodology. *Mancuso v. Consolidated Edison Co.,* 967 F.Supp. 1437, 1444–45 (S.D.N.Y.1997). The court has found no such debits in Dr. Nauman's deposition testimony, affidavits, or report.

The Recochem defendants make much of the fact that Dr. Nauman has "no personal knowledge of the subject in question." Item 1017, p. 16. One example they cite, over and over again, is that because he never sold chlorobenzenes, his reliance on the price listings in the *Chemical Market Reporter* magazine is fatal to his opinion. Recochem emphasizes that since the *Chemical Market Reporter* includes a disclaimer, *id.,* p. 11, the prices listed there are "inherently unreliable...." *Id.,* p. 12. Ralph Carmichael, Recochem Vice–President, disputed the *Chemical Market Reporter* as a reliable source for pricing. "It is based on list prices[,] not distributor or manufacturer

prices or actual transaction values." Item 1027, ¶ 12. Recochem's expert, Al Lifson, Item 1026, ¶ 10(a), and Solvent's President, Bertram White, Item 1025, ¶ 15, also derogated the *Chemical Market Reporter*. Dr. Nauman, on the other hand, posited that the *Chemical Market Reporter*, in business for 125 years, is "widely cited as a source of price and general market information." Item 1049, ¶ 13. This issue may be evaluated at trial. Since *Daubert* and the Federal Rules of Evidence provide that an expert witness "is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation," *Daubert*, 509 U.S. at 592, 113 S.Ct. 2786, the court finds that Dr. Nauman's testimony satisfies the factors set forth in *Daubert* as well. The Recochem defendants' motion to strike Dr. Nauman's affidavit, testimony, and Report, Items 1016 and 1017, is denied.

### D. Mr. Lifson

In its Sur–Reply Memorandum, Solvent argues that the conclusions of Recochem's expert, Al Lifson, "are not supported by any factual foundation and therefore cannot be used to defeat Solvent's motion for partial summary judgment or support the Recochem Defendants' cross motion." Item 1107, p. 1. Solvent cites *Seneca Meadows, Inc. v. ECI Liquidating, Inc.*, 121 F.Supp.2d 248, 253 (W.D.N.Y.2000) for the proposition that a party cannot defeat a well-founded summary judgment motion by simply submitting a contrary expert report that offers only that purported expert's "naked opinion" unsupported by any factual foundation. Item 1107, p. 1.

As the basis of his opinions, Mr. Lifson relies on his almost thirty years of life experience in marketing chlorinated benzene products. Item 1026, ¶ 5. Neither in his report nor in his deposition did Mr. Lifson identify what documents he relied upon to support his conclusions, other than the Joyce and Nauman affidavits submit-

ted by plaintiff. Item 1107, Ex. A, pp. 30–35. Solvent also points to what it considers the many debits in Mr. Lifson's affidavit and report, revealed during deposition, which affect the reliability of his conclusions. Item 1107, pp. 4–10.

However, the court will decline Solvent's invitation to refuse to consider Mr. Lifson's affidavit and report in the cross-motions for summary judgment. Given the liberal standard for expert testimony, articulated above, this court will consider these documents. The court's decision on these motions would not, in any event, rest solely on the information contained in Mr. Lifson's submissions.

## IV. Cross–Motions for Summary Judgment on the Issue of Arranger Liability

### A. Solvent's Motion for Summary Judgment

CERCLA establishes four classes of persons who may be held responsible for costs incurred in responding to releases or threatened releases of hazardous substances: (1) generators of hazardous substances; (2) present or past owners or operators of facilities; (3) transporters of hazardous substances; and (4) those who arrange for the disposal or treatment of hazardous substances. *See Chopra–Lee*, 109 F.Supp.2d at 117. Defendants dispute their liability under CERCLA by challenging Solvent's contention that they either owned or operated the Solvent facility ("owner/operator liability") pursuant to 42 U.S.C. § 9607(1), or whether they arranged for disposal or treatment of the hazardous substances ("arranger liability") pursuant to 42 U.S.C. § 9607(3). The court will address the question of arranger liability first.

### 1. Arranger Liability

Section 9607(a)(3) provides:

(3) Any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility owned or operated by another party or entity and containing such hazardous substances . . .

shall be liable. 42 U.S.C. § 9607(a)(3). The wording of the statute describing arranger liability makes reference to "arrang[ing] for" "disposal" or "treatment" of "hazardous substances." If a party is found to have met the definitions of these terms, it is liable as an arranger.

CERCLA defines the terms "disposal" and "treatment" using the definitions contained in the Solid Waste Disposal Act (SWDA). 42 U.S.C. § 9601(29).[6] Key to these definitions is the fact that some sort of *waste* is being *discarded.* The SWDA's definition of *treatment*

> presupposes discard. . . . Had the authors of CERCLA intended *not* to adopt the presupposition of SWDA, they were certainly capable of defining 'treatment' otherwise. . . . Therefore, "treatment . . . of hazardous substances" as used in CERCLA refers to a party arranging for the processing of discarded hazardous substance or processing resulting in the discard of hazardous substances.

*Pneumo Abex v. High Point Thomasville & Denton,* 142 F.3d 769, 774 (4th Cir. 1998), *cert. denied,* 525 U.S. 963, 119 S.Ct. 407, 142 L.Ed.2d 330 (1998). Similarly, courts "have construed 'disposal' for pur-

poses of section 107(a)(3) as referring only to an affirmative act of discarding a substance as waste, and not to the productive use of the substance." *3550 Stevens Creek Assoc. v. Barclays Bank of Cal.,* 915 F.2d 1355, 1362 (9th Cir.1990). *See also Freeman v. Glaxo Wellcome, Inc.,* 189 F.3d 160, 164 (2d Cir.1999).

The term "arrange for" is not defined in CERCLA. "However, a liberal judicial interpretation of the term is required in order to achieve CERCLA's 'overwhelmingly remedial' statutory scheme." *United States v. Pesses,* 794 F.Supp. 151, 157 n. 21, citing *Florida Power & Light Co. v. Allis Chalmers Corp.,* 893 F.2d 1313, 1317 (11th Cir.1990).

To determine whether arranger liability may be found, the facts and circumstances in each case must be carefully examined. Quoting *Florida Power & Light,* 893 F.2d at 1317, the *Glaxo Wellcome* court set forth the rule agreed upon by the many courts that have grappled with arranger liability: " 'whether an "arrangement for" disposal exists depends on the facts of each case.' " 189 F.3d at 164. No one factor determines arranger liability in this "product versus waste" fact-intensive inquiry. The

> imposition of statutory liability for disposal depends upon examining the transaction with respect to the transfer of the hazardous substance to see if it involved the sale of a product rather than a disposal arrangement.

.     .     .     .     .

---

**6.** The Solid Waste Disposal Act, 42 U.S.C. § 6903(34), defines treatment as "any method, technique, or process, including neutralization, designed to change the physical, chemical or biological character or composition of any hazardous waste so as to neutralize such waste or so as to render such waste nonhazardous, safer for transport, amenable for recovery, amenable for storage, or re-

duced in volume." Disposal is defined in 42 U.S.C. § 6903(3) as "the discharge, deposit, injection, dumping, spilling, leading, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters."

... [T]he court must examine the character of the transaction to determine whether or not a statutorily defined disposal has occurred.

*Prudential Ins. Co. of America v. U.S. Gypsum,* 711 F.Supp. 1244, 1253, 1254 (D.N.J.1989).

When surveying definitions of the phrase "arranged for," the *Glaxo Wellcome* court cited *State of New York v. General Elec. Co.,* 592 F.Supp. 291, 297 (N.D.N.Y.1984) for the holding that "a waste generator's liability under CERCLA is not to be ... facilely circumvented by its characterization of its arrangements as 'sales.'" *Id.* Thus, the rule governing arranger liability in this circuit is, " '[i]f a party merely sells a product, without additional evidence that the transaction includes an "arrangement" for the ultimate disposal of a hazardous substance, CERCLA liability [will] not be imposed.'" *Glaxo Wellcome,* 189 F.3d at 164, quoting *Florida Power & Light,* 893 F.2d at 1317.

To determine whether an arrangement for disposal of a hazardous substance exists, courts have variously assessed the nature of the of the transactions between the parties and have ruled accordingly. Among the matters courts have found significant in making this determination have been:

> the party's knowledge of and control over the disposal, ownership of the hazardous substance at the time of disposal, and the intent of the party; the purpose and inevitable consequences of the transaction and whether the product had value on the market; whether the substance had a productive use or was more properly characterized as waste to be gotten rid of; whether the substance was manufactured as a principal business product or a by-product, and whether, before or after the transaction in issue, the seller disposed of the substance as waste; and whether an already used product which has further usefulness is being sold for the same use for which it was manufactured.

*United States v. American Cyanamid Co., Inc.,* 1997 U.S.Dist. LEXIS 4413 at *16–17 (S.D.W.Va, 1997) (citations omitted).

Courts consider:

> the intent of the parties to the contract as to whether the materials were to be reused entirely or reclaimed and then reused, the value of the materials sold, the usefulness of the materials in the condition in which they were sold, and the state of the product at the time of transferral (was the hazardous material contained or leaking/loose).

*Pneumo Abex,* 142 F.3d at 775, citing cases.

## 2. Useful Product Defense

Recochem argues that the material shipped to Solvent was not waste because it was a product that had value on the market, *i.e.,* a useful product which could be used, as is, for a variety of purposes. Recochem thus relies on the "useful product" defense to arranger liability.

■ Simply put, if the material at issue is "a useful product, then it [is] not waste and not subject to CERCLA." *A & W Smelter and Refiners, Inc. v. Clinton,* 146 F.3d 1107, 1112 (9th Cir.1998).

Just as the sale of a material does not mean that the transaction is not an arrangement for disposal, the fact that a substance is hazardous does not mean that it cannot also be a useful product.. "[A]rranger liability may be defeated when a defendant asserts and proves it was not disposing of, or delivering for treatment, a hazardous substance, but was selling a useful product." *RSR Corp. v. Avanti Development, Inc.,* 68 F.Supp.2d 1037, 1043 (S.D.Ind.1999).

[A] party's characterization of its hazardous substance transaction as a sale

does not automatically preclude a finding that the party is a responsible person under Section 9607(a). Selling hazardous substances as part of a complete, useful product does not generally make a party a responsible person. Neither does selling a useful ingredient in a manufacturing process. However, a party is a responsible person when a transaction—even though characterized as a "sale"—is a sham for a disposal. *United States v. Petersen Sand & Gravel, Inc.*, 806 F.Supp. 1346, 1354 (N.D.Ill.1992) (citations omitted). *See also Prudential*, 711 F.Supp. at 1254 ("the sale of a hazardous substance for a purpose other than its disposal does not expose defendant to CERCLA liability"); *Florida Power & Light Co. v. Allis Chalmers Corp.*, 893 F.2d 1313, 1317 (finding no liability based on the intent of the parties and the fact that transformers were a valuable commodity, despite the fact that transformers contained hazardous substances); *AM Int'l Inc. v. Int'l Forging Equipment Corp.*, 982 F.2d 989, 999 (6th Cir.1993) (focusing on the value and usefulness of the materials sold and the intended purpose to find no liability for sellers of chemicals); *Cadillac Fairview v. United States*, 41 F.3d 562 (9th Cir.1994) (holding seller of styrene liable because party's intent in transaction was for buyer to process styrene and remove hazardous materials from

it so that styrene could be reused). *American Cyanamid* notes that

> the useful product defense is not applicable when the product is deemed to be waste and of no further use to the seller and when it can be shown that the seller's motivation was to get rid of the product, even though the buyer makes further use of the product and pays valuable consideration for it.

1997 U.S.Dist. LEXIS 4413 (S.D.W.Va. 1997) at * 16.

In this circuit, Judge McAvoy addressed the useful product defense in *Cooper Indus., Inc. v. Agway, Inc.*, 987 F.Supp. 92 (N.D.N.Y.1997). He held that "CERCLA liability may not attach if a transaction involves the sale of a new useful product containing a hazardous substance, as opposed to the sale of a substance merely to 'get rid of it.'" *Id.* at 108 (quotation and citations omitted). In *Cooper Industries*, regardless of the fact that the scrap steel at issue could be reclaimed or recycled, it was the intention of the seller "to get rid" of the steel, which was held to be waste. *Cooper Industries* reiterates the importance of the concept of disposal, or 'getting rid of' an unwanted material when ascertaining whether the useful product defense applies or whether an arrangement for disposal exists.[7]

In this case, the issue on summary judgment is whether Recochem intended[8] to

---

7. Courts in other circuits have articulated this requirement as: "'Disposal' refers 'only to an affirmative act of discarding a substance as waste, and not to the productive use of the substance.'" *Catellus*, 34 F.3d at 750; *see also AM Int'l, Inc. v. Int'l Forging Equip. Corp.*, 982 F.2d 989, 999 (6th Cir.1993). *Compare Concrete Sales & Services, Inc. v. Blue Bird Body Co.*, 211 F.3d 1333, 1337 (11th Cir.2000) (court found no evidence to establish that defendant "took any action or had any intent to dispose of hazardous substances") *with A & W Smelter & Refiners, Inc. v. Clinton*, 146 F.3d 1107, 1113 (9th Cir.1998) (defendant attempted to dispose of the materi-

al in a municipal landfill before contracting with transporter, suggesting that it was waste).

8. Courts have differed in their opinions concerning whether a party must have *intended* to arrange for disposal or treatment of a hazardous substance in order to be subject to arranger liability. Some have reasoned that because CERCLA is a strict liability statute, the parties' intent is irrelevant (*Chatham Steel Corp. v. Brown*, 858 F.Supp. 1130, 1138 (N.D.Fla.1994)), while others have found that the CERCLA statute required an intent to arrange for disposal, despite its status as a

"get rid of" its material via the contract between Recochem and Solvent, *i.e.*, the material sold to Solvent had no useful application as it was then constituted until it was processed by Solvent.

### 3. Did Recochem and Kuchar arrange for the transport, disposal or treatment of the substances?

Before a defendant can be held liable under CERCLA as an arranger, it must satisfy three requirements. "First, the defendant must be a 'person' as defined under CERCLA. Second, the defendant must 'own' or 'possess' the hazardous substance at issue; and third, the defendant must, by contract, agreement or otherwise, arrange for the transport or disposal of such hazardous substances." *Mainline Contracting Corp.*, 109 F.Supp.2d at 118 (citing cases).

As indicated in the previous discussion on arranger liability and the useful product defense, the key question is whether the sales of material were arrangements for

disposal of waste material, or sales of useful product. As evidence supporting its position that it was selling a product, not arranging for disposal, defendants cite the affidavits of Bertram White, Ralph Carmichael, and Al Lifson, and the deposition of Kuchar.

### a. Was the material a useful product?

■ On Solvent's motion for summary judgment on this issue, the court must provide Recochem with every inference in its favor, and determine whether a question of material fact exists on the product-versus-waste issue. From an analysis of the record, I conclude that there is evidence to create a question of material fact as to whether the material sold by Recochem, before it was processed or treated by Solvent,[9] was saleable as a useful product. This finding defeats Solvent's motion.

Bertram White was President of Solvent from 1969 to 1980. He also served as Vice President of Domestic Sales for ICC, Solvent's parent company, from 1973 to 1980.

strict liability statute. *United States v. Cello-Foil Products, Inc.*, 100 F.3d 1227, 1231 (6th Cir.1996). Although the Second Circuit has not directly addressed the issue of intent, it appears to align itself with the majority of courts that consider the intent factor when examining a transaction. See *Glaxo Wellcome*, approvingly citing *AM Int'l., Inc. v. Int'l Forging Equipment Corp.*, 982 F.2d 989, 992, 999 (6th Cir.1993), for its holding that "a transfer of chemicals as part of a bulk sale of assets on an 'as is, where is basis' was not an arrangement for disposal where the chemicals were useful and valuable and the parties *intended* that they would be used in a particular manner." *Glaxo Wellcome*, 189 F.3d at 164 (emphasis added). Also, the *Cooper Industries'* court found that the defendant's "purpose for entering into [the] arrangement was to remove the scrap steel from its property" in finding the useful product defense did not apply. 987 F.Supp. at 107.

9. *Catellus* notes that the regulations implementing the Solid Waste Disposal Act

(SWDA), 42 U.S.C. § 6903, provide a detailed discussion of when a recycled material should be considered a waste. The regulations define solid waste as any discarded material which is "[a]bandoned ... [r]ecycled ... or [c]onsidered inherently wastelike....." 40 C.F.R. § 261.2(a)(2) (2001). "However, an exception explains that certain materials to be recycled are not solid waste. Materials are not solid wastes when they can be shown to be recycled by being: (i) Used or reused as ingredients in an industrial process to make a product, provided the materials are not being reclaimed." *Catellus*, 34 F.3d at 752, quoting 40 C.F.R. § 261.2(e) (1993). "A material is 'reclaimed' if it is processed to recover a usable product, or if it is regenerated. Examples are recovery of lead values from spent batteries and regeneration of spent solvents." 40 C.F.R. § 261.1(c)(4) (2001).

Since it is clear from the record that Solvent "reclaimed" the material shipped to it by Recochem, the pertinent question is whether the Recochem material was *already* a useful product *before* it was "reclaimed."

Currently, he is President of BMW Chemicals, Inc., and is an independent contractor for Recochem. Item 1025, ¶ 2. In his affidavit supporting Recochem's position, Mr. White stated that "[a]s far as I am concerned, technical grade ortho is anything below 99% ortho content and over 51% ortho content." *Id.*, ¶ 9. He asserted that Solvent

> marketed technical grade ortho at 65%, 75%, whatever it may be.... Depending upon its end use, we manufactured or we supplied whatever economically the customer could use. If a customer didn't want to pay too much money, we gave them a weaker orthodichlorobenzene, but it was still a technical orthodichlorobenzene.

*Id.*, ¶ 10.

Mr. White asserts that he did not purchase waste product, but rather "purchased streams from which we extracted para and ortho." Item 1025, ¶ 5. He claimed:

> The product shipped to Solvent by Record was a useful product and saleable.
>
> Under my direction, Solvent Chemical never bought waste products. We were not in the waste business and no one from Record Chemical, especially Mr. Kuchar, ever indicated to me that the ortho-dichlorobenzene was something for which they had no outlet. In fact, I knew there was a market for the ortho-dichlorobenzene.

*Id.*, ¶¶ 6, 7. He also challenged Dr. Nauman's statement that 98 percent purity is required for emulsified ortho-dichloroben-

zene, given that Solvent "sold low grade ortho for emulsified ortho." *Id.*, ¶ 16.

White's comments about what constituted technical ortho were echoed by Carmichael, Lifson, and Kuchar. In his affidavit, Carmichael claimed that Record

> sold the same product it sold to Solvent to other customers for a variety of applications, including as a degreaser and emulsified ortho-dichlorobenzene.

> . . . . .

> We did not consider ortho-dichlorobenzene an undesirable by-product[10] of the manufacture of para-dichlorobenzene. We considered it a co-product that could be sold on the market and we did, in fact, sell it.

Item 1027, ¶¶ 8, 9. Based on his 30 years of experience in the business, he stated "any ortho less than pure (99%) and greater than 50% is considered technical grade ortho-dicholorobenzene" and asserted that the 80 percent purity level required by some companies was what was necessary for some customers. Recochem, however, "sold all our ODCB[11] at less than or at about 80%." *Id.*, ¶ 10. "In degreaser, carbon removal, solvent applications they did not have very strict specifications of ortho quality, or the percentage they really wanted was a clean liquid product that was a good solvent." Item 1047, Ex. 2, p. 83. *See also* p. 53.

Al Lifson, Recochem's expert, was employed from 1972 until 1993 by Standard Chlorine Chemical Company, Inc., the "largest manufacturer of chlorinated benzenes in the United States." Item 1026, ¶ 5. From 1993 to the present, he founded his own consulting and marketing firm for

---

10. "By-product" and "co-product" are defined in 40 C.F.R. § 261.1(b)(4). A by-product is "a material that is not one of the primary products of a production process and is not solely or separately produced by the production process. Examples are process residues such as slags or distillation column

bottoms. The term does not include a co-product that is produced for the general public's use and is ordinarily used in the form it is produced by the process."

11. Orthodichlorobenzene.

a full range of chlorobenzene products. In his opinion, based on the Joyce affidavit; the affidavit, expert report, and deposition transcript of Dr. Nauman; and "documents in my possession," *id.*, ¶ 8, he concluded that "the material sent to Solvent by Recochem was a chlorinated benzene product that could be used in the manufacture of other chlorinated solvents and products that contained chlorinated benzenes as their active ingredient. I would not classify this product as a waste product." *Id.*, p. 3. He claimed there was "no minimum requirement of purity for technical grade ortho-dichlorobenzenes. There is pure grade and technical grade. The percentage depends upon the application." *Id.*, ¶ 10(f). As an example, he referred to the product Chloroben PT, emulsified ortho-dicholorobenzene, which his division of Standard Chlorine produced. Standard's specification for Chloroben PT was 70 percent, although "a lesser specification can be used to make emulsified ortho-dichlorobenzene." *Id.*

Kuchar also testified that the material that accumulates in the bottom of the distillation column, the "still bottoms" could be used by blending it into a product used as a degreaser. Item 1047, Ex. 4, p. 41. Even that material was not thrown away. *Id.*, p. 43.

Beyond the affidavit and deposition testimony, there is also documentary evidence that Solvent "on rare occasions" sold ortho of less than 80 percent purity. Item 1048, p. 12. It was not sold as "technical grade," but it was sold nevertheless. *See* Item 1024, p. 13. Solvent insists that such sales did not "demonstrate that there was an established market for such material." Item 1048, p. 12. The record reveals a quote from Solvent to State Chemical Mfg Co., which was "[v]ery interested in lower priced Ortho–Rich CB's." Item 1024, p. 13. The quote indicated four different blends of dichlorobenzenes, ranging from 18 to 70

percent. The record indicates the following: purchase contract between Solvent and Sobin for a product containing 63 percent minimum ortho, *id.*, p. 15; Formula File indicating specifications of ortho content for certain companies purchasing dichlorobenzenes from Solvent—while most indicate an isomer ration of 80 percent ortho to 20 percent para, some companies, such as Cosmopolitan Chemical Company, indicate 50 percent ortho as their specification, and other companies, such as Milwaukee Solvent & Chemical, Neville Chemical Co., Oakite Products, Inc., and Southland Solvents & Chemicals required a product consisting of 70 percent ortho. *Id.*, p. 30. In addition, all the companies listed in the formula file indicated that Solvent could blend high purity ortho with lower grade ortho, ranging from 20 percent to 65 percent pure, to provide them what they required. Solvent points out that a number of the documents demonstrate only that low-grade material was only "offered" for sale. Item 1048, p. 12, n. 11. Even the meta, considered by both Solvent and Recochem as an undesired material, was offered for sale by Solvent. Item 1024, pp. 7, 11, 12, 27.

Thus, the court finds that on Solvent's motion for summary judgment, there is a question of material fact whether the material shipped to Solvent was a useful product or a waste.

### b. Was the material disposed of?

Important to the cross-motions in this case is the issue of whether Recochem, when it sold material to Solvent in the 1970s, also disposed of that material as waste. Solvent claims that, based on Carmichael's testimony, Recochem disposed of material in the 1970s. Although equivocal, Carmichael's testimony does not support Solvent's contention that "when inventories of such material [referring to 50–80% ortho] built up, Recochem would dispose of the material." Item 999, p. 5. Carmichael

was not referring to the 50 to 80 percent pure ortho that Solvent had purchased from Recochem, but "to product that was extremely dark (black), not the normal product of Record that is the subject matter of this case." Item 1027, ¶ 6. Secondly, Carmichael was not clear on the time frame for the disposal. He said: "We may not have disposed of materials in the seventies ... we could have only disposed in the eighties ('80s), I don't know." Item 1047, Ex. 2, pp. 25, 26. Disposal of black residue from the distillation process in the 1980s is not relevant to this case, particularly since Solvent sold the site in 1978. Item 1000, Ex. 3, p. 3. The salient issue here is whether there was disposal of 50 to 80 percent ortho in the 1970s when Recochem sold the material to Solvent.

Furthermore, Carmichael is the only Recochem witness who makes reference to disposal. White asserted in his affidavit that "[u]nder my direction, Solvent Chemical never bought waste products. We were not in the waste business...." Item 1025, ¶ 7. He referred to his deposition testimony that if the ortho that Solvent had purchased from Recochem was a waste product that had to be disposed of, and if Solvent had taken it, he would have wanted Recochem to pay him for doing so. *Id.*, ¶ 8. He added: "Record never paid me to dispose of the ortho-dichlorobenzene. Solvent paid Record for the material." *Id.*

In his deposition, Mr. Kuchar asserted that Recochem "never" disposed of any inventory. "We were selling product...." He could not recall using the services of waste disposal companies. Item 1047, Ex. 4, p. 43. Given that the question of whether disposal occurred is crucial to the determination of whether the material is a product or a waste, the evidence set forth by both Solvent and Recochem on their cross-motions for summary judgment indicates that a question of material fact remains concerning arranger liability.

In some respects, this case is similar to *United States of America v. American Cyanamid Co., Inc.*, 1997 U.S.Dist. LEXIS 4413 (S.D.W.Va.1997). In *American Cyanamid,* defendants Shell Chemical Co. and Shell Oil Co. produced trichloropane (TCP) as a secondary product during a reaction process. After undergoing a refining process, TCP of approximately 70 percent by weight, "technical TCP" was recovered. The question was whether the sales of TCP were arrangements for disposal of a hazardous substance or sales of a useful product. The court held that the transactions were arrangements for disposal, finding that TCP was an unintended by-product in the course of Shell's production of its desired product; that there was no ready market for TCP of the composition shipped to the disposal site; and that both before and after the sales to the disposal site, Shell otherwise treated the TCP as a waste and disposed of it by ocean dumping. *Id.* at *24, *35, *53. In this case, there is at least a question whether ortho was a by-product or a co-product, given that Solvent's expert at one point even refers to Recochem's ortho production as a co-product. Item 997, ¶ 13. It appears that there was some sort of market for the less than 80 percent pure ortho. Furthermore, it is ambiguous whether Recochem disposed of the material that it sold to Solvent during the time frame at issue.

### 4. Elements of Arranger Liability: Recochem

#### a. Is Recochem a "person"?

Recochem acknowledges it is a "person" pursuant to 42 U.S.C. § 9601(21).

#### b. Did Recochem own or possess the hazardous substances?

Recochem disputes that it owned or possessed the hazardous substance at issue,

given that the product sent to the Solvent site "was produced by and shipped from a separate corporation from Recochem. Recochem was merely a marketer. The actual production of the product was done by Chemical Refineries, Inc." Item 1014, p. 9. Recochem cites "hundreds of invoices, receipts, bills of lading and freight documents indicating that all materials shipped to Solvent were coming from Chemical Refineries, Inc. in Napierville, Canada." *Id.*

Solvent points out that the undisputed evidence establishes that Recochem was the entity that sold the material to Solvent, given that the contract provided that Record Chemical Co., Inc. (now Recochem) would supply the material. The contract never referred to Chemical Refineries. Also, Recochem, not Chemical Refineries, invoiced Solvent for the sales. Solvent cites testimony by both Kuchar and Carmichael that Recochem sold the materials generated by Chemical Refineries. *See* Item 1048, pp. 2–3, for references in the record concerning Recochem's role in selling the materials.

■ Solvent's position, that Recochem owned or possessed the hazardous substances, finds ample support in case law.

In furtherance of CERCLA's stated remedial purpose, courts have broadly construed the term 'ownership' to mean more than mere physical possession. In *United States v. Northeastern Pharmaceutical & Chemical Co.*, 810 F.2d 726 (8th Cir.1986), the court stated that "[i]t is the authority to control the handling and disposal of hazardous substances that is critical under the statutory

scheme" in determining whether an alleged arranger owned or possessed the subject hazardous substance, as "requiring proof of personal ownership or actual physical possession of hazardous substances as a precondition for liability under CERCLA § 107(a)(3), 42 U.S.C. § 9607(a)(3), would be inconsistent with the broad remedial purposes of CERCLA."

*Mainline Contracting Corp.*, 109 F.Supp.2d at 118, quoting *Northeastern Pharmaceutical (NEPACCO)*, 810 F.2d at 743–44, and citing other cases. The additional cases cited by Solvent in its Memorandum, Item 1048, pp. 3–4, stand for the same proposition: arranger liability may attach under the broad remedial purposes of CERCLA without actual ownership of the substance, provided that the defendant played a meaningful role in the transactions, *i.e.*, had "the authority to control the handling and disposal of hazardous substances...." *NEPACCO*, 810 F.2d at 743–44. Even a party acting as a broker between a chemical manufacturer and the site where the chemicals were disposed was liable as an arranger. *United States v. Bliss*, 667 F.Supp. 1298, 1306–07 (E.D.Mo.1987).

■ Clearly, Recochem had a meaningful role in the transactions at issue. The fact that it may not have itself *generated* the substances does not absolve it of liability, since that is a separate basis altogether for liability. The court finds Recochem did own or possess the hazardous substances pursuant to the second element of arranger liability, and may be held liable as an arranger if the transactions constituted "arrangements for disposal or treatment" under CERCLA.[12]

---

12. Recochem has pointed out that Solvent discussed the possibility of dismissing Kuchar individually if Recochem would stipulate that it was "the appropriate party to answer for any alleged liability arising under CERCLA for the supply of materials from the Chemical Refineries' Napierville Plant...." E-mail from Brenda Joyce to Mark White, attached to Item 1014. Recochem argues that the e-

#### c. Elements of Arranger Liability: Kuchar

The defendants argue that Kuchar is not personally liable as an arranger. Item 1014, p. 21. They do not argue that Kuchar is not a "person" or that he did not "own or possess the hazardous substances," but rather that Solvent did not present any evidence or case law that provides that a corporate officer could be held personally liable as an arranger. Defendants assert that in order to hold Kuchar liable, Solvent must "pierce the corporate veil" of Recochem or "show direct involvement with the pollution of the site." *Id.* Defendants cite *State of New York v. Shore Realty*, 759 F.2d 1032 (2d Cir.1985), as setting forth the rule that the corporate veil may be pierced if the opposing parties show that the corporate form is being used fraudulently or as a means of carrying on business for personal rather than corporate ends. *Id.* at 1052. This reference, however, relates to liability for abatement under state law for public nuisance, not CERCLA. The defendants also cite *United States v. Bestfoods*, 524 U.S. 51, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998), for the holding that only an "operator" may be subject to liability under CERCLA on the basis of his control over " 'decisions about compliance with environmental regulations' in the absence of derivative liability that results from piercing the corporate veil." Item 1014, p. 22. The defendants go on to say that "[t]he case says nothing about personal liability of an arranger." *Id.*

■ Solvent responds that Kuchar can and should be held liable individually "because he was personally and extensively involved in the transactions at issue." Item 1048, p. 18. Solvent disputes Recochem's interpretation of case law, and cites numerous cases which hold that any individual, including a corporate officer who is directly involved in the arrangements for disposal, not just the polluting activities at the site, can be held liable as an arranger. *Id.*, p. 19. *See United States v. TIC Investment Corp.*, 68 F.3d 1082, 1089–90 (8th Cir.1995); *NEPACCO*, 810 F.2d at 744. Since this liability is direct and not derivative, based solely upon the person's status as a corporate officer, there is no need to pierce the corporate veil. *NEPACCO*, 810 F.2d at 744.

Kuchar's role in Recochem's arrangements with Solvent indicate both a direct and extensive personal involvement. Solvent notes that in their supplemental answers to Solvent's first set of interrogatories, the defendants admitted that Kuchar "was responsible for the commercial agreements/arrangements with Solvent Chemicals [sic]." Item 1047, Ex. 15, p. 2. He admitted his personal involvement in his deposition. Item 1047, Ex. 4, pp. 30, 41. He also signed the contract, described as an agreement between "Joseph Kuchar, representing Record Chemical Co., Inc." and Bert White, representing Solvent. Item 1000, Ex. 13. *See also* Item 1000, Exs. 16 and 17.

If the court eventually finds that the sales of material from Recochem to Solvent represented an arrangement for disposal and treatment under CERCLA, then Joseph Kuchar may be personally liable as an arranger as well.

mail exchange indicates that Solvent "knew" it had sued the "wrong" entity. The court does not consider this as evidence of any material fact, given that the possible liability of Chemical Refineries is irrelevant to Recochem's own arranger liability. Chemical Refineries is not an indispensable party, as a CERCLA plaintiff is not required to sue all responsible parties in order to recover. *State v. Longboat, Inc.*, 140 F.Supp.2d 174, 178 (N.D.N.Y.2001).

## B. Recochem's Motion for Summary Judgment

The evidence and reasoning leading to the conclusion, that there is a question of material fact whether the material was a product or waste, discussed pursuant to Solvent's motion for summary judgment, also serves to defeat Recochem's motion for summary judgment on the same issue.

Solvent has provided ample evidence indicating that, to be useful, the material from Recochem had to be reprocessed. The court finds particularly significant Dr. Nauman's statement that the demand for emulsified products containing less than 80 percent pure ortho, which Recochem asserts there was a market for, "was not high enough to consume all of the chlorobenzene material that could have been emulsified. In Recochem's case, there was surplus material that could have been emulsified but lacked sufficient markets or other uses and was therefore discarded." Item 1049, p. 28. In that regard, his statement that "[t]he mere fact that some of Recochem's material could be sold for use in a few applications does not change my opinion that Recochem sold waste to Solvent," *id.*, p. 25, indicates that there is a question of material fact as to whether the material Recochem shipped to Solvent was a useful product, as Recochem claims.

Further in support of Solvent's position that the material sent to Solvent by Recochem, either via straight sales or the tolling arrangement, was not a useful product but was waste, is the fact that much of the material was off-color. Item 1000, Ex. 24; Item 1000, Ex. 8, pp. 66–68. Technical grade orthodichlorobenzene was essentially colorless. Item 997, ¶ 20. In addition, the meta content in the material was high. Both Recochem and Solvent agree that meta was an undesired isomer produced in the processing of para. *See* Item 1047, Ex. 12, p. 192, 195; Ex. 13, p. 18; Item 997, ¶ 16; Item 1000, Ex. 18. Dr. Nauman

opined that Recochem's process "gave colored products containing high levels of meta-dichlorobenzene that were inconsistent with the industry definition of technical grade ortho-dichlorobenzene." Item 997, ¶ 24.

Solvent relies on deposition evidence which corroborates its point that the material shipped to it was waste, not useful product. Dick Hoffman, former Solvent plant manager, described the chlorobenzene raw materials that Solvent received as "waste products from other manufacturers ... other companies did not want to spend money on to separate them, so we took them at a reduced price and worked on them." Item 1000, Ex. 6, pp. 52–53. The "reduced price" to which Mr. Hoffman makes reference, is the 18–20 cents a pound Solvent paid Recochem for straight sales, Item 1000, Ex. 13, compared with technical grade ortho which sold between 30–33 cents a pound. Item 997, ¶ 28 and Ex. B. As the cases make clear, simply because material is sold does not mean that there is no arranger liability. *See New York v. General Electric Co.*, 592 F.Supp. 291, 297 (N.D.N.Y.1984). The fact that ortho was not the principal product produced by Recochem also has a bearing on whether the material was product or waste.

The court finds that because there is evidence showing the material returned to Solvent via the tolling arrangement contained four times as much meta as the original material sent to Recochem for processing, Item 1000, Ex. 17, that could in itself be considered an arrangement for disposal of the meta, a hazardous substance. Item 1000, Ex. 2. This finding concerning the meta also raises the point that the material shipped from Recochem to Solvent may not be *all* waste or *all* useful product, but could even be considered a mixture of waste and useful prod-

uct—yet another reason that summary judgment would not be appropriate.

Providing Solvent with every favorable inference on Recochem's motion for summary judgment, there is a question of material fact whether the material shipped to Solvent by Recochem was product or waste, thus defeating Recochem's motion for summary judgment.

### C. Conclusion

On this record, the court cannot say, as a matter of law, that the material supplied to Solvent by Recochem was a product or a waste. It therefore denies summary judgment on this issue to both Solvent and Recochem.

### V. Cross–Motions for Summary Judgment on the Issue of Owner/Operator Liability of Recochem and Kuchar as an Individual

By way of its summary judgment motion, Solvent also seeks to hold Recochem and Kuchar liable as owners or operators under CERCLA. The statute deems liable "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of. . . ." 42 U.S.C. § 9607(a)(2). Solvent bases its claim on documentary evidence which it asserts indicates that Recochem and Kuchar "actively operated the plant at least through the end of January, 1978 (and possibly later)." Item 999, p. 23. The Recochem defendants oppose ascribing liability to them under this CERCLA provision on both procedural and substantive grounds. They have also moved for summary judgment on the issue of owner/operator liability. Item 1014, pp. 17–18.

As a procedural fault, defendants argue that Solvent did not plead that Recochem and Kuchar should be liable under CERCLA as owners/operators in the Fifth–Amended Complaint, did not amend their complaint to so allege, and they would be prejudiced if the complaint would be considered amended or allowed to be amended.

On the merits, defendants argue that pursuant to their reading of *Shore Realty* and *Best Foods,* Item 1014, pp. 19–20, there is no evidence that Kuchar ever owned the Solvent site under the name Record or was a stockholder of Solvent. They assert that there is no case law holding that an individual is held personally liable for a company's conducting a due diligence examination of a site. They interpret the testimony of Bert White, Solvent's President, and John Farber, President of Solvent's parent company, as asserting that any operation of the site by Recochem was part of due diligence. Farber Dep., attached to Item 1019, pp. 64–65; White Dep., attached to Item 1019, pp. 62, 68.

In his affidavit, Bert White indicated that "[a]t best, Record conducted a due diligence of the site. . . . Record or Kuchar never operated the site and no papers were ever passed." Item 1025, ¶ 13. The deposition testimony of Mr. Farber went as follows:

Q: Record Chemical never took over the Solvent site, did it?

A: Never bought it, no, but I remember the negotiation. . . . There was a trial period that they operated.

Q: Well, they didn't operate it, you operated it to show them what the plant could do; isn't that correct?

A: Okay. I don't know the details. I only know there was some kind of a trial period where they were at the plant.

Q: They were at the plant watching how the plant operated.

A: Right.

Q: But they were not in charge of operating the plant, were they?

A: I wouldn't be able to tell you.

Q: Papers never passed at any time?

A: Ownership papers, no.

Q: Money never passed at any time?

A: No.

Q: Solvent employees weren't replaced by Record Chemical employees at any time, were they?

A: No.

Q: It was basically to show the people at Record Chemical what the plant was capable of doing, correct?

A: Yes, correct.

Q: And, in fact, after that review, the people at Record Chemical decided not to purchase the site; isn't that correct?

A: Correct.

Farber Dep. pp. 64–65, attached to Item 1020.

Lastly, the defendants assert that Hydroclean, a "totally separate corporation," was in charge during the period of due diligence, and no evidence shows that Kuchar or Recochem controlled Hydroclean. Item 1014, pp. 20–21.

In *United States v. Bestfoods*, 524 U.S. 51, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998), the Supreme Court provided a definition of "operator," which the CERCLA statute does not define.

> [U]nder CERCLA, an operator is simply someone who directs the workings of, manages, or conducts the affairs of a facility. To sharpen the definition for the purposes of CERCLA's concern with environmental contamination, an operator must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations.

*Id.* at 66–67, 118 S.Ct. 1876.

Solvent cites documentary evidence which indicates that Recochem fits the definition of "operator," including: (1) a January 3, 1978 telex from Kuchar to Solvent employees announcing that, as of that day, the plant would "operate as H.C. Niagara Division of Record Group. We wish to assure continuity of the operation and we hope for the best human relationships and technical improvements," Item 1000, Ex. 36; (2) a January 25, 1978 telex from Kuchar to Solvent stating "[w]e have undertaken to direct the operation of the Solvent Chemical Niagara plant for one (1) week to establish during this evaluation period whether or not the plant can operate." Item 1000, Ex. 40.

Solvent also charges that Kuchar was personally involved in the operation. Kuchar outlined production objectives for 1978 "per Joseph Kuchar," Item 1000, Ex. 37; attended a January 5, 1978 meeting at the site and, in a memorandum of that date, identified some former Solvent employees as working for the "H.C. Niagara Division," Item 1000, Ex. 38. Kuchar authored a telex dated January 25, 1978, reciting operational activities conducted at the Solvent plant site (including production of chlorinated benzenes) for one week's period of time, Item 1000, Ex. 40. He authored another telex dated January 31, 1978, setting forth the "operating results of the Niagara Plant during the months of Jan., and 1 week during which we had the mandate to operate the plant." Item 1000, Ex. 41. Solvent also provides an application, with covering letter, from Recochem to the Niagara County Industrial Development Agency dated March 2, 1978, seeking financial assistance related to the Solvent site. Item 1000, Ex. 44.

During January 1978, chlorinated benzene was released into the environment, including a 3,700 gallon spill on January 7, 1978 and an 800 gallon release on January 26, 1978. Item 1000, Ex. 46, 47, 48. Whoever owned and/or operated the site at the time would be liable under CERCLA.

## A. The Procedural Issue: Amendment of the Pleadings

█ Solvent has requested that the court "treat its complaint as effectively amended to include its operator theory of liability, or, if the Court deems it necessary, grant Solvent leave to amend its complaint."[13] Item 1048, p. 26. Thus, Solvent seeks amendment of its pleadings pursuant to Fed.R.Civ.P. 15(b) or, in the alternative, Rule 15(a).

█ The decision to grant or deny a motion to amend a complaint is committed to the sound discretion of the court. *Krumme v. WestPoint Stevens, Inc.*, 143 F.3d 71, 88 (2d Cir.1998). Rule 15(b) provides that the court may allow the pleading to be amended when the presentation of the merits of the action will be served, and the objecting party fails to satisfy the court that admission of such evidence would prejudice the party. When leave to amend is sought pursuant to Rule 15(b), the most important factors for the court to consider are whether the "new" issues raised were tried by the parties' express or implied consent and whether the defendant would be prejudiced. *Cunningham v. Quaker Oats Co.*, 107 F.R.D. 66, 70 (W.D.N.Y.1985). Solvent argues that when issues not raised in a pleading are "tried by express or implied consent of the parties, the pleadings are, in effect,

amended," Item 1048, p. 25, quoting *Federal Aviation Admin. v. Landy*, 705 F.2d 624, 633 (2d Cir.1983).

Solvent recounts various instances which have indicated Recochem and Kuchar's consent to trial on this issue. Solvent points to the depositions of Kuchar and Carmichael concerning the Recochem defendants' alleged operation of the site (without objection), Item 1047, Ex. 4, pp. 18–27; Ex. 2, pp. 89–90; and the Recochem defendants' affirmatively seeking discovery on the issue during the deposition of John Farber, president of ICC. Item 1047, Ex. 21, pp. 63–65, 175–76. Also, in the exchange of e-mails when counsel were negotiating dismissal of Kuchar individually, Solvent indicated they would dismiss him if Recochem stipulated not to oppose a motion to amend to add the operator claim. Item 1047, Ex. 5.

█ The court finds that the merits would be served by allowing the claim; the question is whether the Recochem defendants would be prejudiced. Prejudice, in the context of Rule 15(b), is "indicated when the amendment deprives the defendant of a fair opportunity to defend against the new issues raised and deprives him of the chance to offer additional evidence." *Cunningham*, 107 F.R.D. at 71, citing *Browning Debenture Holders' Committee v. DASA Corp.*, 560 F.2d 1078, 1086 (2d Cir.1977).

Recochem argues that the Fifth–Amended Complaint was filed more than three and one-half years ago, and Solvent has not moved to amend since then. Item 1068, p. 13. The Recochem defendants

---

**13.** The court agrees with Solvent that CERCLA claims do not have to be pled according to the "heightened standard" enunciated in *Cash Energy Inc. v. Weiner*, 768 F.Supp. 892 (D.Mass.1991), but may be pled pursuant to the liberal pleading requirements of Fed. R.Civ.P. 8(a). *See State of New York v. Solvent Chemical Co., Inc.*, 875 F.Supp. 1015, 1018 (W.D.N.Y.1995) (the law of the case); *Warwick Admin. Group v. Avon Products, Inc.*, 820 F.Supp. 116, 120–21 (S.D.N.Y.1993) (refusing to follow *Cash Energy's* heightened pleading requirements in CERCLA cases).

charge that Solvent has been "unreasonably dilatory," that discovery closed and the time for filing its motion for summary judgment expired before it indicated it would seek an implied amendment to its complaint. *Id.,* p. 14. Recochem asserts that "[t]o reopen discovery at this late date would delay the final disposition of the case and cause Recochem to incur additional expense in order to obtain further discovery from individuals whose depositions have already been taken," noting that it would be "unduly prejudiced." *Id.*

The court finds it significant that, in addition to participating in discovery on the issue of operator liability, as outlined above, the Recochem defendants have presented evidence that they claim entitles *them* to summary judgment on the issue of owner/operator liability, both procedurally and on the merits. Considering the complaint amended will not deprive Recochem and Kuchar of a fair opportunity to defend against the issue of operator liability, as they have argued the issue most vociferously in their papers, nor will it deprive them, at trial, of the chance to offer additional evidence. On this basis, the court finds that the Recochem defendants will not suffer prejudice such that amendment of the pleadings would not be warranted.

The court is troubled by the fact that Solvent did not move to amend its complaint earlier, since it was clearly contemplating doing so, as indicated in the e-mail exchange between Solvent and Recochem counsel. Item 1047, Ex. 5. Nevertheless, given the significant discovery on the issue and the liberal standard for amendment, the court will treat Solvent's Fifth–Amended Complaint as amended to include an operator claim against both Recochem and Kuchar.

### B. Substantive Issues

On the merits of operator liability, Recochem has presented evidence that while it was interested in purchasing the Solvent plant, it observed the operation as part of "due diligence." However, during that period of time, Recochem claims that Solvent continued to operate the plant. Farber Dep., attached to Item 1019, pp. 64–65; White Dep., attached to Item 1019, pp. 62, 68. For its part, Solvent provides a number of documents, *supra,* which suggest more than disinterested observation on the sidelines by Recochem and Kuchar. Item 1000, Exs. 36, 37, 40–44. The court finds that there is a question of material fact as to whether Recochem and Kuchar operated the Solvent plant, and denies both Solvent's and the Recochem defendants' motions for summary judgment on this issue, to be resolved at trial.

## VI. Motion for Sanctions

The Recochem defendants also seek sanctions against Solvent pursuant to Fed. R.Civ.P. 11 "for a series of actions taken in bad faith," including: (1) Solvent's naming Joseph Kuchar, individually, as a defendant; (2) Solvent's having retained a purportedly unqualified expert; and (3) Solvent's seeking to hold Kuchar and Recochem liable as operators of the Solvent site, despite the fact that such an allegation is unpleaded and there was no direct evidence supporting the allegation. Item 1022, pp. 3–5. They also raise the issue of expert witness fees, which is the subject of an entirely different motion that has been argued previously, and will not be discussed here. *Id.*

The Recochem papers are remarkable for their dearth of case law on this motion. Besides having no legal basis, the motion has no factual basis, given that the court has held there is a legal basis in allowing Solvent to name Kuchar individually (with liability or non-liability to be found at trial); that Solvent's expert is qualified to give his opinion; and that Recochem and

Kuchar may be considered as operators, with liability or non-liability to be found at trial. The motion for sanctions is denied.

The court will consider the request of Mark A. White, counsel for Record Chemical, to produce a book and writings used by Dr. E. Bruce Nauman, as a motion. Item 1070. It does not appear that Solvent has responded to this request. A response shall be made by August 16, 2002.

## CONCLUSION

Solvent's motion for summary judgment, Item 996, is denied. Specifically, Solvent's motion for summary judgment against Recochem on the issue of arranger liability is denied (*see supra*, p. 340–41); and its motion for summary judgment on the issue of arranger liability against Kuchar as an individual is denied (*see supra*, p. 345). Additionally, Solvent's motion for summary judgment against Recochem on the issue of owner/operator liability is denied (see *supra*, p. 349); and its motion for summary judgment on the issue of owner/operator liability against Kuchar as an individual is denied (see *supra*, p. 349). The argument of Solvent (Item 1107) not to consider the affidavit and report of Al Lifson, Item 1026, is denied (see *supra*, p. 336).

Recochem and Kuchar's cross-motion for summary judgment, Item 1013, is also denied. Specifically, the Recochem defendants' cross-motion for summary judgment against Solvent on the issue of arranger liability is denied (see *supra*, p. 346); and their cross-motion for summary judgment against Solvent on the issue of owner/operator liability is denied (see *supra*, p. 349).

The Recochem defendants' motion to strike the affidavit by Dr. Nauman, Item 1016, is denied (*see supra*, p. 335). The motion to strike the affidavits of Brenda Joyce, Items 1019 and 1067, is denied (*see supra*, p. 331). The motion for sanctions, Item 1022, is also denied (*see supra*, p.

350). The court will also consider the Fifth–Amended Third–Party Complaint amended to allege operator liability on the part of both Kuchar and Recochem (*see supra*, p. 349).

A telephone conference with Messrs. Harkawik and White shall take place on Wednesday, July 31, 2002, at 11:30 a.m.

So ordered.